# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

| | |
|---|---|
| WENDY SNEAD, and EDWARD MOREDOCK, individually and on behalf of all others similarly situated, ) ) ) | Civil Action No. 3:17-cv-00949 (Consolidated with: 3:17-cv-00958) |
| Plaintiffs. ) | |
| ) | CLASS ACTION |
| v. ) | |
| ) | Judge Trauger |
| CORECIVIC OF TENNESSEE, LLC f/k/a ) CORRECTIONS CORPORATION OF ) AMERICA ) | Magistrate Judge Brown |
| ) | |
| Defendant. ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

**COMES NOW** the Plaintiffs, Wendy Snead, and Edward Moredock, individually and on behalf of all others similarly situated, and for their causes of action against the Defendant would allege as follows:

## PRELIMINARY STATEMENT

1.  The Plaintiffs and the proposed class include those individuals currently and formerly housed at the Metro-Davidson County Detention Facility in Davidson County, Tennessee, a prison operated by CoreCivic of Tennessee, LLC, f/k/a Corrections Corporation of America (CoreCivic) pursuant to a contract with the Metropolitan Government of Nashville and Davidson County, Tennessee. During the time of their incarceration, the Plaintiffs and proposed Class Members were entirely dependent on the Defendants to provide them with access to basic health care. However, they have been, and with regard to those still incarcerated, continue to be, deprived of access to basic healthcare.

1

2.      Plaintiffs bring this Class Action seeking damages and injunctive relief on behalf of themselves and all others similarly situated due to the Defendant's deliberate indifference to their serious medical needs while they were incarcerated, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and their prohibition against cruel and unusual punishment.

3.      Plaintiffs and Class Members were exposed to *Sarcoptes scabiei* (hereafter "Scabies") caused by the spread of parasitic mites.

4.      Defendant operates a private for-profit prison and therefore had direct control of the prisoners in its charge infected with scabies. The Defendant deliberately failed to adequately screen those entering its facility, respond to inmate requests for medical attention, treat those infested with the parasite, quarantine the infected individuals in its care, or to take any other necessary precautions to prevent the spread of scabies outside the facility. This caused a foreseeable and preventable systematic outbreak which spread to the Plaintiffs and all others similarly situated.

## THE PARTIES

5.      Plaintiff Wendy Snead is a citizen of the State of Tennessee and a resident of Cheatham County, Tennessee. She is a former inmate who was housed in the Defendant's facility in Davidson County.

6.      Plaintiff Edward Moredock is a citizen of the State of Tennessee and a resident of Davidson County, Tennessee. He is a former inmate who was housed in the Defendant's facility in Davidson County.

7.      The Defendant, CoreCivic of Tennessee, LLC, is a limited liability company organized under the laws of the State of Tennessee, with its principal place of business located at 10

2

Burton Hills Blvd., Nashville, TN 37215. CoreCivic's registered agent for process in the State of Tennessee is C T Corporation System, 800 S. Gay St., Suite 2021, Knoxville, TN 37929-9710. The Defendant owns and operates the Metro-Davidson County Detention Facility under contract with the Metropolitan Government, housing prisoners sentenced to confinement in the Tennessee Department of Correction. As such, CoreCivic performs a public function traditionally reserved to the state and is therefore subject to suit under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 seeking to redress a deprivation of the Plaintiffs' rights by the Defendants acting under color of law, which rights are secured by the Eighth Amendment to the United States Constitution.

9. This complaint concerns the violation of civil rights, and this Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10. All of the claims alleged herein arose in the Middle District of Tennessee, and Venue is therefore proper pursuant to 28 U.S.C. § 1391.

## ALLEGATIONS OF FACT

11. The Defendant houses pretrial detainees with other inmates serving sentences in a 1,300-bed jail facility located at 5115 Harding Place, Nashville TN 37211. There is no distinction in the conditions of their confinement.

12. As the allegations of this Complaint will demonstrate, the Defendant refused to provide the healthcare needed and requested by Plaintiffs and all Class Members. The Defendant repeatedly failed and refused to provide inmates with access to doctors and necessary medicine.

3

13.     The Defendant's failure to provide medications and medical treatment to inmates is systemic and intentional, including, without limitation, the following:

a.  The Defendant is well aware of the need to respond to sick call requests within a reasonable period of time.  It is obligated by contract to ensure responses to sick call requests within 24 hours or less, yet it intentionally and repeatedly fails to do so.  On average, initial sick call responses take two-weeks to one-month before inmates are allowed to be seen by a nurse.  Referrals to doctors take months.

b.  The Defendant is well aware of the risk of spreading infectious diseases in its facility. It is obligated by contract to hire staff in charge of infection control, but has failed to hire anybody in this position for at least one, and possibly for up to four (4) years.

c.  The Defendant is obligated by contract to procure and review the medical records of inmates transferred to the facility who have "special health care needs," which include those infected with communicable diseases, pregnant inmates, mentally ill and handicapped inmates, and those experiencing detoxification from alcohol or drugs.  The Defendant, however, fails and refuses to procure those records, despite actual knowledge of their necessity.

d.  The Defendant does not utilize any procedure for screening inmates for mites or other parasites during intake.

e.  Between January and August, 2017, the mental health physician was absent for at least a month and apparently walked off the job, during which time, no mental health patients were prescribed any medication.

4

f.  The Defendant routinely runs out of mental health medications, and often fails to refill those prescriptions for weeks, posing serious risks to inmates due to the abrupt cessation of required medicine. A male inmate was out of the mental health drug, Gabapentin, but the Defendant falsified the inmate's medical chart to state that he was receiving it.

g.  The pharmacy nurse was absent from work for two to three weeks, starting on or about Memorial Day through at least June 9, 2017, during which time no medications were ordered or reordered. The Defendant has failed and refused to train other staff on the procedures for ordering medications, despite the obvious risk that medications would not be ordered in the event of the pharmacy nurse's absence. Every day, numerous inmates go without receiving one or more of their medications.

h.  Many inmates require medication such as Clonidine to treat high blood pressure. The Defendant is required to keep such medications in stock, but has gone without it, sometimes for up to a week. The Defendant is well aware that missed dosages of blood pressure medication greatly increases the risk of heart attack, stroke, heart failure, and kidney failure.

i.  The Defendant does not keep inmate's medications in alphabetical order. The Defendant's resulting inability to find medications often results in inmates not receiving them.

j.  The Defendant is aware that medical emergencies have been called in and that employees are not responding.

k.  The Defendant routinely fails to give the majority of a pod, or entire pod, their medications during pill call. Warden Charlie Peterson was made aware of this situation

5

and was told that inmates have repeatedly reported this to nursing staff. Thereafter, the Defendant refused to allow inmates to speak with nurses during pill call, and inmates are no longer given copies of their sick call requests.

l. The Defendant fails to announce pill calls in a manner in which inmates can hear it. Nurses are not allowed to travel to the pods to provide inmates their medications. If an inmate misses a pill call, whether because they are in the Rec Room, attending education classes, or using the lavatory, there is no way for them to receive their medication.

m. Personnel without medical licensure are refusing to comply with a doctor's orders or to fill prescriptions as written. The Defendant's Health Services Administrator ("HSA") instructs nurses to call the doctor and inform him that they are not going to fill the prescription as written. Doctors have prescribed medication required to be administered four (4) times a day, but the medication is intentionally only administered twice a day, contrary to the doctor's orders.

n. A male inmate was prescribed breathing treatments twice a day, but went days without receiving it. After nursing staff repeatedly brought this to the Defendant's attention, the HSA said, "This is becoming quite a habit, isn't it?"

o. The HSA, who is not a licensed medical provider, has instructed medical staff to refuse to prescribe medication, including Ivermectin used to treat scabies, and instead to provide cheaper, over-the-counter products such as Benadryl, which would only mask symptoms without actual treatment of the underlying cause.

p. Numerous inmates are authorized for prescriptions that are designated as Keep On Person ("KOP"). However, if they are taken to segregation, their medications are taken

6

from them, and the Defendant's medical staff routinely fails to confirm that inmates receive their medications. When KOP medications are exhausted, inmates will go days or weeks without refills.

q. A significant amount of medication is routinely "lost" by the Defendant's staff. When medications for one inmate run out, they will take it from another, resulting in confusion and the denial of prescription refills because the time to refill the inmate's prescription has not yet arrived. The mishandling of medication includes narcotics. One inmate reported to the Defendant that insulin from a used syringe was re-injected into the vial and used lancets have been recapped and placed in the same container with new lancets, even after the inmate reported that they had a communicable disease.

r. A handicapped male inmate requires the use of a colostomy bag, but the Defendant fails to provide him with sufficient replacement bags. He is therefore forced to rinse the bag out in the sink that is used by all of the inmates, or in the shower where they bathe.

s. The Defendant has failed to provide inmates with prescribed opioid medication for chronic cancer pain for weeks or months, leaving them to suffer.

t. A male inmate suffered an injury to his hand, severing a tendon. He was prescribed pain medications four (4) times a day to control the pain. Instead of administering the medication as prescribed, non-medical staff reduced the administration to three (3) times a day, informing nursing staff that they did not have time to administer the medication, and that if they did, they "would have to do it for everyone." In response to an employee's complaint about the procedure, the HSA stated that they should never administer medications more than twice a day, regardless of doctor's orders.

7

u. The Defendant has been advised that additional medication has been provided by certain nurses under the assumption that the medication is resold to other inmates. The Defendant is aware certain nurses are not crushing medications, the purpose of which is to prevent inmates from hiding pills in their cheek to be sold to other inmates. Some inmates have refused to accept crushed medications, which should have been noted.

v. Employees who have reported the lack of medical care to inmates and the lack of training on internal procedures, have been reprimanded, threatened with discipline, or intimidated. There is an overall failure to train nursing staff, including, without limitation, the proper procedures for pill call, sick calls, intake procedures, release of inmates, medical emergencies, and ordering or re-ordering medication, including emergency refills.

w. When nurses fail to show up to work, the Defendant does not divide that nurse's assignment or delegate duties in order to ensure that inmates receive medical care.

x. Despite scabies infestations being diagnosed by physicians for inmates, former inmates, and employees, the Defendant continues to deny that there is or ever was any infestation. The intentional misrepresentation of these infestations has contributed to its spread throughout the facility. Regardless of whether the skin rash spreading through the facility was scabies, treatment with actual medication is nonetheless required but has been consistently denied. Inmates with open sores are susceptible to *Staphylococcus aureus* ("Staph" infections), which are life-threatening unless treated with medication.

y. Inmate grievances/complaints regarding the lack of health care were ignored by the Defendant. The Defendant's policies impose a 72-hour limit on responding to an

8

informal complaint, which is ignored. Grievances are not even presented to the staff member against whom the complaint was filed.

z. Nurses have been sent to the units with a UV light or "black light," ostensibly to detect the presence of scabies on an inmate's skin through luminescence. They not only lack the training do so, the black light is designed for corneal abrasions. They have been advised that this device would not detect the presence of the scabies mite, but are apparently still utilizing it for this improper purpose. Persons are employing this device with no training whatsoever.

aa. During the scabies outbreak alleged in this lawsuit, skin scrapings to verify the presence of scabies were not performed.

14. The risk of a scabies infestation in prisons and other facilities which house large numbers of individuals is well known. The Defendant's systemic failure to provide medical care and treatment to inmates resulted in an outbreak of scabies, which spread throughout the Defendant's facility.

*The Scabies Outbreak*

15. The Defendant frequently received and housed members of the homeless population, who would cycle in and out of the facility on a regular basis. These individuals had no healthcare and were susceptible to scabies infestation. The Defendant did not provide a medical screening prior to placing inmates in the general population at the facility. The Defendant did not employ any person or implement any protocol to screen individuals for infectious diseases or parasites, enabling the introduction and spread of diseases from new arrivals to the inmate population.

9

16.	In the Summer of 2016 and thereafter, there was a scabies outbreak in the Defendant's facility. The outbreak spread throughout the inmate population and those likely to come in contact with them, including CoreCivic employees and court staff in Davidson County.

17.	Plaintiffs Wendy Snead and Edward Moredock's exposure to scabies was caused by the spread of parasitic mites among other inmates who were denied treatment. Those infested with the parasite develop a visible rash, which was made known to the Defendant by observation and experience, and by frequent complaints, grievances, and requests for medical treatment by the inmates.

18.	Scabies is most easily transmitted by skin-to-skin contact, but is not the only means of transmission. The mites can live for two to five days away from the host on clothing and bedding. Eggs deposited off the host can hatch in seven (7) days. They can infest new hosts through shared clothing, bedding, carpets, and furniture. After hatching, the mites are capable of reproduction in another 10-14 days.

19.	The mites burrow under the outer layer of skin, ingesting tissue as they burrow. Female mites lay their eggs at the end of the tunneled burrows, and larvae hatch two to three days after the eggs are laid. After hatching, the mites remain in the burrow for up to one day, and then crawl away to excavate their own burrows. The mites crawl at a rate of up to one-inch per minute on the surface of the skin and can readily move to a new individual when skin-to-skin contact is made. Any person who has direct contact with someone who has scabies, however brief, may be at risk for infestation.

20.	The mites cause intense itching, which facilitates re-infestation and skin eruptions that transfer the mites to new hosts. The infestation causes a visible skin rash due to the sensitization and allergic reaction to the proteins and feces of the parasite. Itching and the

10

rash may affect much of the body or be limited to common sites such as between the fingers, wrists, elbows, genitals, waist, belt line, thighs, feet, ankles, underarms, buttocks, and/or shoulder blades.

21.    The scabies infestation leads to relentless and unbearable itching, especially at night. The rash results in scales, blisters, bleeding, and open sores caused by scratching. The rash is readily distinguishable from other skin maladies due to the appearance of track-like burrows in the skin, which are created when female mites tunnel under the surface of the skin. Due to the severity of the itching at night, those infested with the parasite experience an inability to sleep until they have been treated and the infestation is in remission. The inability to sleep and perpetual discomfort can result in mental illness and/or severe emotional distress. The infestation results in permanent, visible scarring, and can trigger autoimmune diseases, such as eczema or psoriasis, which are permanent in nature.

22.    Skin lesions caused by the mite may become infected with secondary microorganisms, such as Staph infections and *Streptococcus pyogenes*. If left untreated, the infections can cause kidney damage from a condition known as postinfectious glomerulonephritis (PIGN). Prescription medications, including multiple rounds of Ivermectin pills and Permethrin cream applied to the entire body, are required in order to eradicate the infestation.

23.    The Defendant knew that scabies outbreaks are common in a crowded jail setting where inmates are housed together, share living quarters, and come into frequent contact with one another. Although the Defendant has an infection control policy, it failed and refused to follow it prior to, during, and after the scabies outbreak at the facility.

11

24. In July 2016, an intense skin rash consistent with a scabies infestation spread throughout the male inmate population. Inmates submitted sick call requests for medical treatment, but instead, received over-the-counter products such as hydrocortisone cream, Benadryl, and other topical ointments that masked the symptoms. The rash began spreading throughout the inmate population.

25. Plaintiff Moredock was housed in the Defendant's facility in August, 2016 to serve a sentence for a DUI conviction. He became a trustee who assisted with the maintenance of the Defendant's facility. Plaintiff Moredock was placed in the living area for older inmates, which also housed those with physical and mental disabilities. Plaintiff Moredock's pod had approximately 140 inmates. The beds were cramped and inmates had to touch other inmates' beds in order to ascend and descend their bunks.

26. Several inmates in Plaintiff Moredock's bunk area played cards with inmate "C.M.", who had the rash on his hands. Soon afterward, these inmates developed the rash on their hands and arms, which spread to other areas of their body.

27. Plaintiff Moredock attempted to avoid exposure to inmates who had developed the rash, which was quickly spreading throughout the male inmate population. He ate his meals on his bunk, stayed on his bunk, and tried to avoid the common areas.

28. Despite his efforts, in October of 2016, Plaintiff Moredock developed the rash, which was consistent with a scabies infestation, including red bumps and track-like burrow marks on his skin, accompanied by an intense and painful itching near the sores.

29. Although Plaintiff Moredock was not given an initial screening upon his entry to the Defendant's facility, he was required to have a health screening in order to work as a trustee at the Defendant's facility. He had previously complained generally about the screening

procedure, and the lack of tuberculosis ("TB") testing for new arrivals. The Defendant stated that Plaintiff would be provided a TB test, but it was never administered. Mr. Moredock was screened for the first time ninety (90) days after his arrival, and he complained about the rash that had spread over his body. The Defendant falsely informed Plaintiff that the rash was caused by "contact dermatitis," a reaction to the water, or "something in the laundry."

30. By October of 2016, the rash had spread to the female population. Male inmates continued to submit sick call requests for treatment for the rash, all of which were ignored. Male inmate, "C.M." filed a grievance over the lack of medical treatment and was then placed in solitary confinement for two days as punishment.

31. By November of 2016, the scabies infestation at the Defendant's facility was widespread. The Defendant was well aware that the rash was consistent with a scabies infestation and was the most likely cause, but falsely told inmates that they did not have scabies.

32. Because Plaintiff Moredock's initial request for treatment of the rash was ignored, he filed another sick call request in November of 2016. He described symptoms of an obvious scabies infestation. Mr. Moredock stated that he had developed the rash several weeks prior, that it had spread over his arms and legs, and that the itching would not stop.

33. Because the Defendant refused to address Plaintiff Moredock's medical needs, he asked a friend to download the "WebMD" Internet page for scabies. Plaintiff provided the printout to the Defendant, who continued to ignore his complaints.

34. Plaintiff Moredock began working as a trustee in December of 2016. His job was to assist with the maintenance and repairs to the Defendant's facility. In furtherance of his work, Plaintiff traveled among the pods for both male and female inmates. He saw that

13

individuals in every pod had developed a rash consistent with a scabies infestation and were openly complaining about it.

35. On December 4, 2016, Plaintiff Moredock filed a sick call request which stated, "2nd attempt to get treatment for the scratching and itching on my arms and legs. I have Scabies! Please Help Me!" The form indicated that he had the rash for seven weeks. At least forty (40) other inmates in his pod also had scabies. Following numerous complaints, the Assistant Warden came and spoke with the inmates. He stated that he would "get with medical" to address the situation, but never did so.

36. Plaintiff Moredock and other inmates feared retaliation for requesting medical assistance. The Defendant frequently intimidated inmates, falsely and impertinently stating that the Davidson County judges had a financial interest in CoreCivic, ownership of stock, and that a Plaintiff would lose any lawsuit filed against the company.

37. Numerous men in Mr. Moredock's pod suffered from physical and mental handicaps and/or disorders. The handicapped population was particularly vulnerable to abuse and neglect because they were unable to care for themselves. Although the handicapped inmates were covered with obvious scabies infestations, the Defendant was unwilling to offer them any assistance. By nature of their disabilities, these inmates were unable to determine what was wrong, how to voice their concerns, and how to seek medical attention.

38. Because of their disabilities, numerous handicapped individuals would not shower for several weeks, allowing scabies to spread throughout their bodies and the general population.

39. Toward the end of December 2016, Plaintiff Moredock had still not been treated for the scabies infestation after suffering for over three (3) months. Plaintiff finally complained

14

that because he was moving in and out of the Warden's office, he needed treatment to avoid spreading it to him. The Defendant finally prescribed medication to Mr. Moredock in January of 2017, but only because of his proximity to the Warden.

40.     On or about January, 2017, an employee of the State of Tennessee came to test the water at the facility. Despite no finding of contamination, the Defendant continued to deny that inmates were infested with scabies, stating that the water was the source of the rash.

41.     In order to remediate a scabies infestation, the Defendant must gather an infested inmate's contaminated clothing in a biohazard bag, to be washed separately. The Defendant failed and refused to do so, however, and washed the contaminated clothes together with those of healthy individuals, both male and female.

42.     As part of his job duties, Plaintiff Moredock worked on the boilers and in other areas of the Defendant's facility. Although the prison boilers are supposed to achieve a temperature of 160 degrees in order to sanitize laundry, the Defendant's boiler temperature was frequently well below that temperature due to disrepair. Mr. Moredock complained to the Defendant about an inability to properly bring certain equipment into working order. The employee informed him that, because CoreCivic only leased the premises and the building belonged to Metro, they only needed to perform the bare minimum repairs in order to temporarily fix problems. The employee explained that the Defendant did not want to spend money on repairs.

43.     In January of 2017, the Defendant finally admitted that some of the male prisoners had scabies. Some were provided oral medication but were not quarantined. The Defendant refused to acknowledge obvious scabies infestations in other inmates and retaliated against them for even mentioning the word "scabies" by placing them in solitary confinement or

15

threatening the same. Because the Defendant monitors phone calls, the inmates who spoke about scabies over the phone lost their phone privileges.

44. Male inmate "D.B." had also been infested with scabies for many months. His requests for medical attention, complaints, and grievances were likewise ignored. On or after January, 2017, D.B.'s wife reported these concerns to the Metro Health Department, but no action was taken. Because of the Defendant's delay and refusal to treat D.B., he developed permanent scarring all over his body.

45. Male inmate "J.N." was housed at the Defendant's facility. He frequently complained about the rash over his body. His sick calls and complaints were ignored. J.N.'s mother informed the Defendant that her son's rash appeared to be scabies, which the Defendant denied. In response to his requests for medical attention and his complaints, the Defendant threatened J.N. instead of providing treatment. Because he was unable to sleep and constantly suffered from the itching, J.N. suffered a mental breakdown, in response to which, the Defendant placed him in solitary confinement without treatment. J.N.'s mother contacted the Defendant's medical staff and begged for assistance for her son, which was ignored. Sometime later, J.N. was provided Benadryl but not anti-scabies medication, which only masked his symptoms without treating the underlying infestation.

46. Although Plaintiff Moredock ultimately received a round of medication to treat scabies, the Defendant took no other action to quarantine infested individuals from the general population. The Defendant would only launder the inmates' wool blankets once every 30 to 90 days, enabling the scabies to re-infest individuals who received treatment.

16

47.     On or about December 13, 2016, Class Member Jennifer King was sent to the Defendant's facility as a pretrial detainee. She was housed within the "D Pod" for approximately one month.

48.     In January 2017, Plaintiff Wendy Snead was housed in "A Pod" at the Defendant's facility for a five-month DUI sentence. Plaintiff had been charged in 2013 and had remained sober in the four years since her charge, but was still required to serve the sentence.

49.     In January, 2017, Ms. King transferred to "E Pod," after exhibiting symptoms of scabies infestation, including a visible and painful rash.

50.     In February of 2017, a pregnant female inmate was transferred to the Defendant's facility. She specifically informed the staff that she had been diagnosed with scabies. The Defendant did nothing to obtain or review her medical records, follow up on the status of her scabies infestation, or otherwise quarantine her from the general population.

51.     By the end of March, 2017, the majority of female inmates housed in the Defendants' "Echo Pod" had developed the rash.

52.     On March 10, 2017, Plaintiff Moredock filed another sick call request, which states, "I HAVE NOT received my scabies treatment drug? It was ordered on 3-6-17. 6 pills. No one seems to know anything on the pill cart?" In response, the medical staff wrote "Ivermectin reordered; had more but given last dose." On 3/13/17, a member of the medical staff crossed out the statement and wrote in, "Benadryl & refer to MD."

53.     Plaintiff Moredock was not rid of the parasite after the initial dose of medication in January. He continued to submit additional sick call requests, which were not addressed by the Defendant. By March of 2017, Mr. Moredock continued to complain that he had not received his medication. He ultimately suffered from scabies for six months. Because of

17

the Defendant's failure to provide access to medical care, Mr. Moredock had to seek treatment after his release in May of 2017 at his own expense. He was unable to return to work due to the risk of spreading the infestation to others, and incurred lost wages as a result.

54.　In April of 2017, the Defendant provided a few of the male inmates with medication to treat scabies, but denied medication to others. The selective treatment and lack of quarantine facilitated the spread of the scabies infestation. On or about April 15, 2017, a male inmate who had been diagnosed with scabies in January of 2017, was finally provided a referral to an outside dermatologist for treatment, after filing multiple sick call requests and grievances. At least 30 to 40 inmates in his pod had the same rash, which was typical of the other pods for both male and female inmates.

55.　On or about May 1, 2017, after the Defendant's repeated failure to treat or quarantine inmates infested with scabies, approximately fifty (50) female inmates in Echo Pod authored a letter and attempted to mail it to the Metro Health Department. The letter described the spread of the rash and the Defendant's failure to treat inmates. Because the Defendant monitors the inmates' mail, the letter was confiscated.

56.　A second letter dated May 8, 2017, was addressed to the Health Department and signed by forty-nine (49) female inmates housed in the Defendant's "Echo Pod." The letter states:

"Nashville/Davidson County Department of Health

We are writing to request help. If you do not have the authority to step up, we ask that you please contact a state or federal agency that can and will. **Since mid-March the women here at CCA in E-pod have been suffering from some type of fungus, insect, mite or spider bites. We have itchy and painful bites, [welts] in some cases all over our bodies from head to toe.** Besides the 4 brown recluse spiders I've killed and have kept, and the drain in the bathrooms has files/gnats, but they say they can't find anything. And it is not a couple of women. It is affecting 80 of the 100 women that are currently being housed here.

18

We have been to medical. Some were not diagnosed but only given hydrocortisone and Benadryl. A couple were told it was dust mites and prescribed triamcinolone 0.1% cream. None of this has helped at all.

On May 5th the staff here decided to wash our sheets and blankets because of numerous complaints. They only washed one section of the pod's bed clothes. Nevertheless, the problem has become more aggressive since.

[Name redacted] received a letter from Mr. Nelson, our maintenance supervisor, threatening to write her up if she writes any more inmate request forms about the bites. [Name redacted] has that letter along with the 4 spiders.

The entire E unit (Echo) is covered in mold and dust. Every 4-6 weeks they paint over it all. There are worm type insects in our shower drains. The entire shower walls and floors are covered in mold. **We have asked the Warden, officers, case manager and counselor for help. No one cares or will help us. It's not 20-40 bites on each person. It is more like 50-70 bites. We cannot sleep.** This last week a cricket and a roach were found on our dinner trays in our pod. When we asked for an exterminator to spray, the maintenance man came in our pod with 2 small spray bottles of bug spray like a woman would purchase at Walmart. This is a unit of 100 women that sleep, eat, shower and use the restroom in a very small space. We rarely leave this room.

**This effects the community. We have contact with our families, children, babies and our loved ones on Sundays during visits. Women go to court Mon.-Fri and have contact with lawyers, P.O. officers, mental health workers, and other inmates from other counties. Some women return from court and are released that day. There are women released from E-pod every day. This bug issue, fungus, mold spore infection, or whatever is spreading at an alarming rate. Not one woman is getting better, only worse. It is very serious. Many of us look like we have shingles, scabies, or chicken pox.**

Also the ceiling in our open bunk area has several leaks. When it rains, women on the top bunks get wet. There is mold and dust on all the walls, more noticeable on the top near the pipes and the ceiling. We do not have any air conditioning or any ventilation in our common area. This is where we eat, shower, use the restroom, watch TV, make phone calls, and socialize.

**We are asking you to please help us! We are miserable and have tried every possible solution. So far the situation is only getting worse**."
(emphasis added)

57.    In a letter dated May 9, 2017, another female inmate states:

19

"[Name Redacted] was transported to Meharry Hospital for a pregnancy checkup. The Doctor at Meharry told her that she has scabies. She was brought back to CCA and returned to Echo unit. No one has been treated yet."

58. In a letter dated May 9, 2017, a different female prisoner states:

"[Name Redacted] was taken to Meharry Hospital for a pregnancy checkup. The Doctor at Meharry informed her that she has scabies most likely contracted at CCA in Echo unit. Transportation returned [name redacted] to CCA w/ her medical papers. However, the medical staff here still refuses to treat us."

59. Despite the diagnoses of scabies by doctors at Meharry Hospital, the two pregnant female inmates were not provided medication to treat scabies until sometime in June, after the Metro Health Department intervened. One of the pregnant females was allowed to travel to a re-entry program, where she came in contact with the public. The program instructor spoke with the Warden about the inmate's infestation on at least two occasions. Everyone in the Class had to be treated for scabies.

60. In May of 2017, Ms. King was transferred from E Pod into A Pod. By this time, King was covered from head to toe with the visible rash and it was obvious that she had been afflicted with it for some time. The Defendant falsely advised Ms. King that she was not contagious. Prior to King's arrival, no inmates in Plaintiff Snead's unit showed any symptoms of a scabies infestation.

61. Ms. King requested medical treatment and complained about the Defendant ignoring her complaints and refusing to provide medical services. Ms. King complained to the Warden, the Assistant Warden, the case managers, and the guards. She filed numerous grievances, all of which went unanswered and ignored by the Defendant.

62.  Ms. King begged the Defendant for relief and treatment.  It was not until February 2017 that she was given access to a doctor.  Pursuant to the Defendant's official policy, custom, and practice of ignoring requests for medical attention, the Defendant denied that King had any medical issues despite her obvious distress and visible rash, and refused to allow her to obtain outside medical treatment.

63.  One of the inmates in A Pod had attended nursing school and recognized the rash.  She complained to the Defendant that the rash appeared to be a scabies infestation.

64.  Ms. King was placed in an 8-person cell, in close proximity to Plaintiff Snead and others.  The women in this cell quickly started developing the rash on their bodies.  Other women in A Pod started developing the rash as well.

65.  One inmate refused to go into the same room as King because she had seen people with scabies infestation before and knew that King had the infestation.  The Defendant did nothing in response to the inmate's repeated complaints.

66.  On or about May 1, 2017, a female guard employed by the Defendant searched the Internet for pictures of scabies.  She informed the Plaintiff Class that the rash spreading through the inmate population appeared to be a scabies infestation.

67.  Inmates began openly talking about the spread of the rash being a scabies infestation.  In response, guards employed by the Defendant began threatening Plaintiff Snead and other inmates that if they mentioned the word "scabies," complained about it, or filed a grievance, they would be placed in solitary confinement.  The guards informed Plaintiff and others that female inmates from E Pod, from which Ms. King had transferred, had been placed in solitary confinement for discussing the scabies infestation. In so stating, the

21

Defendant acknowledged that inmates had been complaining about scabies in E Pod for some time prior to Ms. King's transfer to A Pod.

68.    Inmates attempted to inform their family members about the scabies infestation over the phone and asked their families to research scabies on their behalf.  Because the Defendant monitors all phone calls, those inmates immediately had their phone privileges revoked, in retaliation for attempting to bring light to the epidemic.

69.    On May 7, 2017, Plaintiff Snead noticed red bumps developing on her right arm that resembled insect bites, which were accompanied by intense itching and a biting sensation.

70.    On May 8, 2017, the bites continued to spread and the itching intensified.  Plaintiff Snead showed a nurse, who dismissed Plaintiff's report and merely advised that Plaintiff change her soap.  Plaintiff informed the nurse that she had been using the same soap for the last four months with no issues.

71.    By May 9, 2017, Plaintiff Snead's body was covered with the bites and rash, and she requested another sick call.  By May 11, inmates were noisily complaining that the rash was scabies.  Plaintiff's request for a sick call had still not been fulfilled.

72.    Plaintiff Snead thereafter began filing formal grievances due to the refusal of the Defendant to provide her access to medical treatment.  From May 9 until her departure from the facility, Plaintiff filed seven (7) grievances in total, none of which were ever addressed by the Defendant.

73.    Because of the Defendant's deliberate indifference to the grievances filed by Plaintiff Snead and others, the women promised to file a new grievance each day until the Defendant addressed the issue, all of which were ignored or discarded by the Defendant.

22

74. By May 12, 2017, the itching was unbearable and Plaintiff Snead was unable to sleep. Her request for a sick call was ignored by the Defendant, and any of Plaintiff's attempts to speak about the sick call were met by the Defendant with anger and dismissal.

75. On May 13, 2017, Plaintiff Snead was still unable to sleep and there was no response to her request for a sick call. Because of the Defendant's conduct, she feared disciplinary action if she attempted to follow through on her request for a sick call. Plaintiff, desperate for some sort of relief, broke down in tears to the Assistant Warden and begged for medical treatment, but none was ever provided.

76. Plaintiff Snead had gone 72 hours without any sleep due to the intense itching, which was a frequent occurrence until her release. Plaintiff was physically, mentally, and emotionally tormented by the sensation of insects biting her and the inability to obtain any relief from the Defendant. Plaintiff Snead became physically ill from the stress, developing a fever and chills. She attempted to obtain a sick call to handle the fever, which was refused by the Defendant.

77. On May 14, 2017, Plaintiff Snead was unable to hug her daughter during the Mother's Day visit due to fear of spreading the rash. Plaintiff was devastated. Due to the Defendant's deliberate indifference to her medical needs and continued refusal to respond to Plaintiff's request for medical attention, Plaintiff experienced emotional distress and hopelessness.

78. On or about May 15, 2017, the acting Assistant Warden, Ms. Hayes, came to Echo Pod and addressed the female inmates. She stated in words or substance, "So I hear that people have problems. How many people are itching?" Approximately 100 women raised their hands, to which Assistant Warden Hayes responded, "that's some bull**it!" A female inmate stated, "That's not bull**it, we're getting eaten alive in here and y'all need to do

23

something about this!" Asst. Warden Hayes yelled, "You sit the f**k down and shut the f**k up!" Guards then handcuffed the inmate in full view of the other females and took her to solitary confinement for two weeks.

79.    On May 15, the Defendant placed its facility on lock down for 48 hours, during which time inmates were unable to communicate with their family members. Plaintiff Snead was unable to communicate with her family and still had not received any response to her request for medical attention.

80.    On May 17, 2017, Plaintiff Snead was finally able to call her family, who reported the situation to the Metro-Nashville Health Department.

81.    On May 18, 2017, a Nurse Practitioner employed by the Defendant saw Plaintiff Snead and refused to acknowledge the obvious presence of scabies. Numerous inmates reported that the rash was scabies and that they had begged for help. Met with the Defendant's deliberate indifference, Plaintiff's family requested that the Health Department intervene.

82.    On May 19, 2017, Plaintiff Snead was transported to a dermatology center in Franklin, Tennessee after her family member had made numerous calls to the Metro Health Department. She was accompanied by a CoreCivic employee who transported her and was present during the evaluation. Ms. Snead was diagnosed with scabies, which is designated by ICD-10-CM code "B86" on her medical record. She was prescribed the following treatment regimen:

> "Start Elimite cream, 5%, 1app, applied topically TO AREAS OF RASH
> LEAVE ON 12 HRS THEN SHOWER, once at NIGHT AND REPEAT
> IN 7 DAYS, 1 dose(s), 45, Refills 3
> Start ivermectin tablet, 3 mg, 4 orally, once 7 day(s), 8, Refills 3
> Start tramcinilone topical cream, 0.1%, 1 app, applied topically, 2
> times a day, 14 days, 60, Refills 0

83. The Defendant was specifically informed that all female inmates in Ms. Snead's pod required treatment for scabies. The Physician's Assistant noted in the record:

"She is currently incarcerated and living in a room of several girls. **They all have the same rash. I told the patient and the correctional officer that they all need treating.** Pt gets out of jail in about 10 days. She was instructed to return here if she did not improve by 4 weeks."

84. Upon Ms. Snead's return from the dermatology clinic, the Defendant informed her that they would not fill her prescriptions. Ms. Snead was sent to solitary confinement and denied a meal tray, a mattress, and access to her personal belongings. She was provided a single round of pills the next day. She was not allowed to shower for five days, and was deprived of clean clothes and sheets, in retaliation for requesting medical treatment.

85. Plaintiff Snead was not allowed to call her family. The Defendant's retaliation towards Plaintiff was intended to intimidate Plaintiff and other inmates from filing grievances, seeking outside medical treatment, or otherwise reporting the scabies outbreak to individuals outside of the Defendant's facility.

86. Also on May 19, 2017, Ms. King made a court appearance before Judge Steve Dozier in the Davidson County Criminal Court. A copy of the transcript is attached as **Exhibit A**. Ms. King informed the Court that she was enrolled in the Sheriff's Anti Violence Effort ("SAVE") program but that she could not continue because she had a rash covering her body. She stated that she had the rash for four months. Judge Dozier asked Ms. King what programs she was unable to attend because of the rash:

"The Court:        What's the – what has this kept you going through?

Ms. King:         Everything, because they are –

The Court:        You can't go to the SAVE program?

|  |  |
|---|---|
| Ms. King: | Right. They are like –I started a couple of weeks and then I had to go to Med-Op and they tried to get it to heal up. So I just really need to go to the hospital, I do." |

87. Ms. King was released on probation on or about May 21, 2017. She immediately went to the Baptist Hospital ER and was diagnosed with scabies. The ER doctor at Baptist prescribed her the medications needed to eradicate the scabies infestation, which she had been suffering from for over four and a half months while in the Defendant's custody.

88. A hot shower is one of the few forms of temporary relief from the intense itching caused by scabies. Plaintiff Snead repeatedly requested a hot shower but the Defendant refused to allow her to do so, without any justification.

89. Immediately after her release, Plaintiff Snead went to the ER and finally obtained the medical attention that the Defendant had failed and refused to provide. Plaintiff has incurred hundreds of dollars in expensive medication costs, expenses for alternative housing at a hotel to avoid infesting her house, and additional expenses in the cost of fumigating and remediating the infestation from the furniture, linens, and other items within her home.

90. Between May 15 and June 15, 2017, the Defendant began returning the grievance forms and sick call request forms that the inmates had submitted and instructed them to change their content. The Defendant made inmates sign documents falsely stating that their rash was not scabies or falsely stating that they had been "treated," when in fact they had not.

91. The Defendant's pharmacy nurse was absent from work for two to three weeks between May 29 and June 9, 2017, during which times medications were not ordered or re-ordered.

92. In mid-June, 2017, male inmate "J.C.," who had been filing sick call requests to treat his rash for several weeks, was handed five pills by prison guards who were not medical staff.

He was not told what the medication was or informed of any side effects. The men were never provided a follow-up dosage of medication, which is necessary.

93. Throughout June 2017, the Defendant continued to ignore sick call requests from inmates requesting treatment for the rash, and continued to threaten them if they mentioned the word "scabies."

94. The scabies infestation had also spread to the Defendant's own employees. As of June 22, 2017, approximately seventeen (17) CoreCivic employees were diagnosed and treated for scabies. Members of their families, including infants, have also been infested and required treatment. Those that notified the Defendant, sought treatment, or filed Worker's Compensation claims have been retaliated against, including having baseless written reprimands placed in their personnel files.

95. On or about June 13, 2017, male inmate "D.W." was finally seen by a doctor, having filed numerous sick calls and grievances over the previous three (3) months. Although the doctor took pictures of his rash and conducted a skin scraping to confirm the presence of scabies, D.W. was informed at that time that his rash was not scabies despite obvious symptoms. He was not quarantined. Two days after the skin scraping, inmate D.W. was quarantined, informed that tests had confirmed the presence of scabies, and was prescribed six (6) Ivermectin pills to treat the infestation.

96. On June 26, 2017, the Metro Health Department interviewed male inmate "C.M." C.M. informed them that he had the rash since September, 2016. C.M. was provided pills and cream for the scabies.

97. On July 5, 2017, the Defendant's Health Administrator falsely informed prisoners that no one had been diagnosed with scabies.

27

98.  On or about July 17, 2017, the Health Department came to the Defendant's facility. Twelve (12) male inmates who had filed grievances about the lack of medical treatment were placed in solitary confinement before the Health Department's arrival and were unable to speak with them to inform them of what was occurring in the facility.

99.  Plaintiffs have permanent scarring and are still recovering from the sores left from the parasites.  They have been unable to return to work after their release due to the risk of spreading the mite to others, and have therefore incurred lost wages.

100. Despite actual knowledge of the infestation among the prisoner population, and the intensely contagious nature of it, the Defendant failed to take reasonable steps to mitigate the infestation, to quarantine inmates, or to treat those afflicted with a known scabies infestation.

101. The spread of the infestation was reasonably foreseeable and the Defendant failed to take reasonable steps to mitigate the infestation.  As a direct and proximate result of the Defendant's acts and omissions, the Plaintiffs and Class Members became infested.

102. By virtue of the scabies infestation, Plaintiffs and the Class Members were forced to endure painful, itching rashes and sleeplessness while they were housed at the facility.  After their release, they were forced to be quarantined, to be absent from work, to miss important family functions and event, during the time they were quarantined and recovering from the infestation.  They have incurred the costs of medical treatment, which is ongoing.  The scabies mites have spread within their homes, to their children, and other family members.

103. Plaintiffs have incurred additional expenses for cleaning supplies and professional cleaning services to mitigate and remediate the scabies infestations in their homes.

28

104.    Plaintiffs have experienced and continue to experience pain, suffering, emotional distress and humiliation from the scabies infestations within their bodies and their homes.

## ADMINISTRATIVE PREREQUISITES

105.    Upon their arrival at the Defendant's facility, Plaintiffs were never provided a copy of the Defendant's policies and procedures manual or any other document explaining the grievance process or any other administrative procedure.  Plaintiffs were forced to sign a document stating that they received a handbook, even though none was provided.

106.    Plaintiff Snead specifically complained that she never received a handbook and that the Defendant's rules were unclear.  No handbooks were provided to any other inmate.  No copies were available at the prison library.

107.    During their confinement, Plaintiffs learned how to file a grievance and to request a sick call by speaking with other inmates, who had also learned by way of mouth.  By filing the grievances, Plaintiffs complied with all requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA") and had exhausted their administrative remedies. Plaintiffs' numerous grievances were deliberately ignored by the Defendant, and they therefore had no ability to appeal any decision, none having been made by the Defendant.

108.    Plaintiffs and other Class Members were threatened from making any complaints or filing any grievance, which threats included being placed in solitary confinement, deprivation of food, clean clothes, bedding, and the ability to bathe, as well as the loss of phone privileges. To the extent that individuals did not file grievances because of the Defendant's express threats of retaliation, and actual retaliation to Plaintiffs and others, the administrative process was unavailable.

109. Because the Defendant's conduct indefinitely delayed and nullified any administrative process, the administrative remedies required of the PLRA were unavailable to Plaintiffs and other Class Members.

110. To the extent that administrative remedies remain unexhausted for those still housed at the facility, those Plaintiffs are entitled to injunctive relief while they continue to exhaust administrative grievance procedures.

111. The PLRA is inapplicable to Plaintiffs and those Class Members who are no longer confined in the Defendant's facility.

## CAUSES OF ACTION

### COUNT I: DELIBERATE INDIFFERENCE TO PLAINTIFFS' SERIOUS MEDICAL NEEDS IN VIOLATION OF PLAINTIFFS' RIGHTS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

### [42 U.S.C. § 1983]

112. The Defendant is a private entity that contracts to perform traditional state function of operating a prison, and the Defendant's employees performed governmental functions. The Defendant's officials, therefore, acted under color of law.

113. The Defendant's official policies and customs of ignoring and/or substantially delaying requests for medical treatment caused the violation of the Plaintiffs' constitutionally protected rights.

114. Plaintiffs' infestation with scabies constituted a sufficiently serious medical need for treatment. Plaintiffs were confined under conditions posing a substantial risk of serious harm.

115. Due to the extremely contagious nature of scabies infestations, the failure to promptly treat scabies posed an obvious and substantial risk of harm to other inmates.

116. Dozens of grievances and requests for medical attention were filed by Plaintiffs and members of the Class and submitted to prison officials, all of which were ignored. The officials knew there was a substantial risk of serious harm to Plaintiffs and members of the Class, but failed to act.

117. Despite the numerous pleas for medical assistance, the Defendant did not even summon a medical professional to examine Plaintiffs or members of the Class.

118. Prison officials, including the Warden and Assistant Warden, the prison guards, and nursing staff, all had actual and/or constructive knowledge of a widespread scabies infestation spreading throughout the Defendant's facility. These officials had knowledge of the Plaintiffs' asserted serious needs, or were aware of the circumstances clearly indicating the existence of such needs, or subjectively perceived a risk of harm, but then disregarded it by failing to take reasonable measures to abate it.

119. Plaintiff Snead's medical need was diagnosed by a physician as mandating treatment, which was subsequently ignored by the Defendant. The Defendant refused to provide Plaintiff with her prescription medication and retaliated against her for seeking outside medical treatment.

120. The need to treat scabies is obvious, even to a layperson. The condition visibly spread to more areas on the body of infested inmates. It is apparent that a delay in treating a scabies infestation would detrimentally exacerbate the medical problem.

121. The medical conditions of Plaintiffs and members of the Class worsened as a result of the Defendant's refusal to provide medical services.

122. Because of the Defendant's continued, deliberate indifference to Plaintiffs' medical needs, the inhumane conditions of confinement constituted cruel and unusual punishment within the meaning of the Eighth Amendment.

123. The pattern and practice of ignoring all inmate complaints was the product of the policies and customs of the Defendant.

124. The prolonged deprivation of medical treatment was serious and addressed the specific, basic human need for medical treatment and access to medical treatment. The deprivation to Plaintiffs' and members of the Class was sufficiently severe to constitute inhumane prison conditions.

125. The Defendant acted with malice when it retaliated and disciplined Plaintiffs and Class Members for exercising their right to demand medical treatment.

126. As a result of the Defendant's actions, Plaintiffs were deprived of their fundamental rights guaranteed by the United States Constitution, including the right to adequate medical care for their serious medical needs while in the custody of the state. The Defendant's actions described herein violated the Eighth Amendment's prohibition against cruel and unusual punishment, and the Fourteenth Amendment's guarantee of substantive due process.

127. As a direct and foreseeable result of the Defendant's violations of Plaintiffs' rights, Plaintiffs have suffered and will continue to suffer physical injury and scarring, the nature of which is permanent.

**COUNT II: VIOLATION OF PLAINTIFF'S RIGHTS TO DUE PROCESS FOR FAILURE TO PROTECT AND EXPOSURE TO STATE CREATED DANGER**

128. Plaintiffs and members of the Class were involuntarily confined or restrained against their will, pursuant to a governmental order or by the affirmative exercise of state power by the Defendant.

129. By virtue of the special relationship of the state-imposed custodial setting, the Defendant was under an affirmative obligation to spend its resources to protect Plaintiffs and members of the Class from harm.

130. The Defendant had exclusive control over the movement and placement of inmates in its custody. The Defendant knowingly and intentionally transferred infested inmates into the crowded cells of healthy inmates, placing them in close proximity to a dangerous contagion. Plaintiffs and the Class Members had no ability to transfer away from infested inmates.

131. The Defendant's failure and refusal to treat the scabies infestation allowed it to spread to new hosts and caused the infestation to intensify and spread. The Defendant, therefore, was the primary cause of the dangers to which Plaintiffs were exposed and increased the vulnerability of Plaintiffs to these dangers.

132. The Defendant, having created the danger confronting the Plaintiffs, owed a corresponding duty to protect Plaintiffs by isolating those infested with scabies and to immediately treat them.

133. The Defendant's failure and refusal to acknowledge or respond to the scabies infestation deprived Plaintiffs and members of the Class of their rights to due process, guaranteed by the Fourteenth Amendment to the U.S. Constitution.

## COUNT III: FAILURE TO TRAIN

### [42 U.S.C. § 1983]

134. The Defendant failed and refused to train its medical staff on at least the following:

   a. The procedures for pill call, sick calls, intakes, releases, accuchecks, medical emergencies, seizures, chest pain, and handling inmates going through withdrawal;

b. The procedures for ordering and reordering medication, including how to order medications on an emergency basis;

c. The procedures for covering the shifts of employees and delegating their tasks when they fail to show up for their shifts;

d. The procedures for calling doctors in emergency situations;

e. The procedures for dispensing medications in the event an inmate misses a pill call due to a lock-down, during count times, or for any other reason in which an inmate has missed a required dosage;

f. The procedures for administering medications via central IV lines;

135. The Defendant failed and refused to train its employees upon the proper methods and means to detect, prevent, and treat scabies infections within its facility. The incidents of infestation were prevalent, involving hundreds of inmates. Notice from Plaintiff Snead's dermatologist that she had scabies was alone sufficient to alert the Defendant of a genuine danger.

136. The Defendant's refusal to acknowledge the infestation, when confronted with at least dozens, if not hundreds of medical requests and grievances, is indicative of a profound lack of understanding, and is evidence of a failure to train.

137. The Defendant's training was wholly inadequate to the tasks that the employees performed and the inadequacy was the result of the Defendant's deliberate indifference. The Defendant's inadequacy was closely related to and/or actually caused the injury at issue.

138. The Defendant was deliberately indifferent to the need to train its employees to address the obvious need of inmate access to medical care and medication.

139.    The Defendant's failure to train lead to the deliberate indifference to, and denial of, inmates' access to medical care.

**CLASS ACTION**

140.    Plaintiffs seek Class certification of all claims pursuant to Fed.R.Civ.P. 23. The Defendant has acted or refused to act on grounds that apply generally to the Class, so that the claims for damages and for final injunctive relief is appropriate, respecting the class as a whole.

141.    The Plaintiff Class is defined as all inmates who have been denied medical treatment including those infested with scabies and not treated for the condition, those who have been denied medication as prescribed, those who have been denied sick calls and thus denied medical treatment as a consequence of their imprisonment having been housed at the Defendant's facility in Davidson County.

142.    The number of persons whose rights have been similarly violated by the Defendant are too numerous to join in this action. The Plaintiff Class Members are readily identifiable using records maintained in the regular course of business by Defendant.

143.    The questions of law described in this Complaint and the facts regarding them are common to all persons who were exposed and subsequently contracted scabies because of the acts of the Defendant.

144.    One common question is whether the Defendant has a policy or practice of refusing to provide Plaintiffs with medical care and retaliating against them when they seek outside medical care.

145.    Another common question is whether the Defendant fails to train its employees adequately in regard to the medical needs of inmates infested with scabies, in deliberate indifference

to the obvious need for such training, and whether it maintains its lack of training in deliberate indifference to the serious medical needs of its inmates infested with scabies.

146.   The claims of the Plaintiffs are typical of claims of this Class, as their claims arise from the same policies, practices, acts, and omissions as those of the Plaintiffs' Class.   The named Plaintiffs' claims are based on the same theory as the claims of the respective Class.

147.   Plaintiffs have been injured as a result of the Defendant's actions addressed in this lawsuit in the same way as the other members of the proposed class.

148.   The Plaintiffs will fairly and adequately protect the interests of the Class.   The named Plaintiffs do not have any interests antagonistic to the interests of the Class.

149.   By way of this lawsuit, the named Plaintiffs, on behalf of the proposed Class, seek in part to enjoin and restrain the unlawful acts and omissions of the Defendant.

150.   The prosecution of separate claims would create a risk of inconsistent adjudications among members of the proposed Class, and might establish inconsistent standards of conduct by the Defendant.

151.   Adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of other members not parties to the adjudication, and might substantially impair or impede their ability to protect their interests.

152.   The interests of Plaintiff as a Class representative are identical to the interest of each Class Member.

**INJUNCTIVE RELIEF**

153.   The Class Members who are currently incarcerated have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and injunctive relief sought herein is their only means of securing adequate relief.

36

154.  The Class Members are now suffering, and will continue to suffer, irreparable injury from Defendants' unlawful conduct as set forth herein, unless enjoined by this Court.

155.  Plaintiffs' Class Members seek a permanent injunction enjoining the Defendant, its agents, employees, and all those acting in concert with the Defendant under color of state law, from continuing to violate the Eighth and Fourteenth Amendments of the U.S. Constitution and to immediately cease intimidating, threatening, and retaliating against inmates for demanding medical care for their serious medical needs and to immediately provide adequate oral and topical medication sufficient to fully treat all those diagnosed with scabies.

156.  Plaintiffs' Class Members seek a permanent injunction requiring the Defendant to provide a full medical staff adequate to meet the needs of those infested with scabies and capable of dispensing medication and monitoring their treatment until completion.

### DAMAGES

157.  Plaintiffs bring this suit for all damages recoverable by law including, without limitation, damages for personal injury, for pain and suffering caused in the past and future, for loss of enjoyment of life past and future, for lost wages, for impairment of the Plaintiffs' capacity to earn income, and for all medical expenses which are reasonable and necessary and made necessary by the acts and omissions of the Defendant.

158.  In addition, because of the reckless and intentional conduct of the Defendant, Plaintiffs and each member of the Class are entitled to punitive damages.

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment as follows:

1.  That process issue to the Defendant to plead or respond in the time provided by law;

37

2. That the Court determine, as soon as practicable and consistent with the requirements of Fed. R. Civ. P. 23, by order that Plaintiffs' proposed class action may be maintained, and provide notice as may be appropriate pursuant to Rule 23;

3. That the Court upon final hearing declare and find that the Defendant was deliberately indifferent to the health and safety of the Plaintiffs' Class Members;

4. That Plaintiffs' Class Members be awarded a judgment against the Defendant for all damages available under Tennessee and federal law as will fully compensate the Plaintiffs' Class Members for all injuries caused by the Defendant's actions and failure to act, as alleged herein;

5. That Plaintiffs' Class Members be awarded punitive damages for the Defendant's fraudulent, intentional, reckless, and malicious conduct;

6. That this Court find that the policies, practices, procedures, conditions and customs of the Defendants are violative of the rights of Plaintiffs' Class Members as secured by the Eighth and Fourteenth Amendments of the U.S. Constitution.

7. That Plaintiffs' Class Members be awarded the costs of bringing this suit, including reasonable attorney's fees and litigation expense pursuant to 42 U.S.C. § 1988 and applicable law;

8. That Plaintiffs and the other members of the Class be awarded such general relief to which they may be entitled, at law or in equity.

Respectfully submitted,

THE BLACKBURN FIRM, PLLC


_____/s/ Gary Blackburn_____
W. Gary Blackburn (#3484)
Bryant Kroll (#33394)
213 Fifth Avenue North, Suite 300
Nashville, TN 37219
P: (615) 254-7770
F: (866) 895-7272
gblackburn@wgaryblackburn.com
bkroll@wgaryblackburn.com

Jeffery S. Roberts, #20263
JEFF ROBERTS & ASSOCIATES, PLLC
213 Fifth Avenue North, Suite 300
Nashville, TN 37219
P: (615) 425-4400
F: (615) 425-4401
Jeff@middletninjury.com

R. Joshua McKee
THE MCKEE LAW FIRM
213 Fifth Avenue North, Suite 300
Nashville, TN 37219
P: (615) 425-4400
F: (615) 425-4401
rjm@rjmckeelaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served upon the

following via this Court's electronic CM/ECF filing system:

Joseph F. Welborn, III (#15076)
Erin Palmer Polly (#22221)
Butler Snow LLP
The Pinnacle at Symphony Place
150 Third Avenue, South
Nashville, Tennessee 37201
(615) 651-6700
(615) 651-6701

                    /s/ Bryant Kroll

40