**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **WENDY SNEAD and EDWARD MOREDOCK, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:17-cv-0949 (Consolidated with 3:17-cv-0958)** |
| **v.** | ) ) | **Judge Aleta A. Trauger** |
| **CORECIVIC OF TENNESSEE, LLC f/k/a CORRECTIONS CORPORATION OF AMERICA,** | ) ) ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the plaintiffs' Motion for Class Certification. (Doc. No. 19.) The motion has been fully briefed and is ripe for review. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I. Factual and Procedural Background

The original Class Action Complaint (Doc. No. 1) initiating this lawsuit was filed by plaintiff Wendy Snead on June 16, 2017. Named plaintiffs Wendy Snead and Edward Moredock filed the First Amended Class Action Complaint ("Amended Complaint") (Doc. No. 15) on October 27, 2017. The Amended Complaint asserts claims against defendant CoreCivic of Tennessee, LLC, formerly known as Corrections Corporation of America ("CoreCivic"), under 42 U.S.C. § 1983, based on the defendant's alleged deliberate indifference to the serious medical needs of current and former inmates while they were incarcerated at the Metro-Davidson County Detention Facility ("MDCDF") in Davidson County, Tennessee, a facility operated by

CoreCivic, in violation of the inmates' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

The plaintiffs seek to certify three subclasses, defined in their Motion for Class Certification as follows:

> ***The Scabies Class:*** All current and former inmates who had a skin rash consistent with a scabies infestation who were denied treatment, or whose delayed treatment by the Defendant caused the inmate's condition to worsen, since October 1, 2016.

> ***The Denied Prescriptions Class:*** All current and former inmates who were prescribed medication that was not administered as prescribed, or whose prescribed plan of treatment was interrupted or delayed by the Defendant, since October 1, 2016.

> ***The Denied Medical Attention Class***: All current and former inmates who requested, but were denied medical attention or treatment since October 1, 2016.

(Doc. No. 19, at 1.)

According to the allegations in the Amended Complaint, CoreCivic is a for-profit prison company that operates MDCDF, a 1,300-bed facility that houses male and female pretrial detainees and convicted prisoners serving sentences. There is no distinction between the detainees' and prisoners' conditions of confinement. Both Snead and Moredock are former prisoners of MDCDF, having already served their sentences prior to filing this lawsuit.

The Amended Complaint asserts that CoreCivic has repeatedly and intentionally failed and refused to provide healthcare to inmates, including by denying them access to doctors and necessary medication. The pleading contains numerous allegations regarding CoreCivic's specific failures, including that, despite a contractual obligation to respond to sick call requests within twenty-four hours, CoreCivic's medical staff typically takes two to four weeks to respond to a sick-call request by allowing an inmate to see a nurse. "Referrals to doctors take months." (Doc. No. 15 ¶ 13(a).) Despite a contractual obligation to employ staff to oversee infection

control, CoreCivic has not employed anyone in those positions for at least one and possibly four years, and it does not use any procedure for screening inmates for scabies or other parasitic infections during intake. And, despite a contractual obligation to do so, it does not procure or review the medical records of inmates transferred to the facility who have special health care needs. It routinely runs out of mental health medications and fails to refill prescriptions for weeks, which poses a serious risk to inmates due to the abrupt cessation of necessary medication. It falsifies medical charts to cover the failure to provide prescribed medication to inmates as prescribed and systemically and intentionally fails to provide necessary medical treatment and medication to inmates. It is chronically understaffed and retaliates against inmates for complaining about their lack of access to adequate care.

The condition called scabies is caused by an infestation by a parasitic mite, Sarcoptes scabiei. The mites easily hop from one person to another by skin-to-skin contact but can also live from two to five days away from a host on clothing, bedding, carpets, and furniture. The mites burrow under the outer layer of a person's skin, ingesting tissue as they burrow. (Am. Compl. ¶ 19.) Female mites lay eggs at the end of the burrowed tunnels, and the larvae hatch in two to three days. The newly hatched larvae soon crawl away to excavate their own tunnels, crawling at a rate of up to an inch per minute. Any person who has direct skin contact with someone who has scabies, however brief, is at risk of an infestation. (*Id.*)

The scabies mites cause a skin rash that is readily identifiable as a result of the "track-like burrows in the skin" (*id.* ¶ 21) and is accompanied by intense, nearly unbearable itching, especially at night. The itching may make sleep impossible, giving rise to a whole host of other problems, particularly for persons with preexisting mental health conditions. The associated scratching facilitates re-infestation and skin eruptions that then make it easier for the mites to

transfer to a new host. It also typically results in scales, blisters, bleeding, open sores, and a resulting risk of secondary infections, such as life-threatening Staph infections. A scabies infestation can only effectively be treated with prescription medications, including often multiple rounds of ivermectin pills and permethrin cream applied to the entire body. (*Id.* ¶ 22.)

The plaintiffs allege that CoreCivic knew that scabies outbreaks are common in crowded jail facilities and that implementation of an infection-control policy was necessary in such a setting, but it failed and refused to implement and follow an effective infection-control policy prior to, during, or after the scabies outbreak at the facility.

A scabies infestation began spreading among the male inmate population of MDCDF in July 2016. Moredock was sent to MDCDF beginning in August 2016 to serve a sentence for a DUI conviction. He was placed in a living area for older inmates and those with physical and mental disabilities. His pod housed approximately 140 inmates in cramped quarters. Despite attempts to avoid contact with other inmates with an obvious rash, Moredock contracted scabies in October 2016, accompanied by intense and painful itching.

Although Moredock did not receive a health screening or tuberculosis test upon entry, when he was appointed to a prison job as a "trustee" a few months after his arrival, he was required to have a health screening. He was screened for the first time ninety days after his arrival, at which time he complained about the rash that had spread over his body. He was falsely informed that he had "contact dermatitis" or a reaction to "something in the laundry." (Doc. No. 15, ¶ 29.)

The infestation spread to the female inmate population by October 2016. Meanwhile, male inmates continued to submit sick call requests for treatment, which were ignored. Some inmates were placed in solitary confinement solely in retaliation for filing grievances related to

the lack of medical treatment for the condition.

By November 2016, the scabies infestation at MDCDF was widespread. The defendant was allegedly aware that the rash symptoms exhibited by a large number of inmates were consistent with scabies but continued to falsely inform the inmates that they did not have scabies.

Moredock's initial request for treatment was ignored, so he submitted a second sick-call request in November 2016, describing symptoms that were obviously consistent with scabies. Because the defendant refused to adequately address his medical needs, Moredock submitted a printed copy of the "WebMD" internet page discussing scabies to the defendant, which continued to ignore his complaints.

Moredock began working as a trustee in December 2016, which meant that he was responsible for assisting with the maintenance and repairs at MDCDF. In the course of his work, he traveled among housing units ("pods") for both male and female inmates and personally saw that inmates in every pod were suffering with a rash consistent with scabies and were openly complaining about it.

Moredock filed another sick-call request on December 4, 2016, stating affirmatively that he had scabies. At that point, at least forty other inmates in his pod also had scabies. Many of these were disabled inmates who were particularly vulnerable to infestation and also not capable of voicing their own needs or seeking medical attention. CoreCivic refused to provide treatment for these inmates' scabies infestations.

 Following numerous complaints, the assistant warden came and spoke with the inmates, affirming that he would "get with medical" to address the situation, but he never did. (Am. Compl. ¶ 35.) Moredock and other inmates feared retaliation for requesting medical assistance related to their condition.

By the end of December 2016, Moredock had been suffering from scabies for over three months and had not received treatment. Finally, he pointed out that he was doing maintenance work in the warden's office and risked spreading scabies to the warden. At that point, in January 2017, Moredock received treatment.

In January 2017, an employee of the state of Tennessee tested the water at the facility. Despite no finding of contamination, the defendant continued to falsely claim that the inmates' rashes were caused by the water rather than by scabies. However, around the same time, the defendant finally admitted that some of the male prisoners had scabies. Some were provided oral medication but none were quarantined. The defendant refused to acknowledge obvious scabies symptoms in other inmates and retaliated against some for requesting treatment for scabies by placing them in solitary confinement. Inmates who spoke on the phone to outsiders complaining about scabies lost their phone privileges.

The Amended Complaint mentions several specific inmates, by their initials, who suffered scabies and did not receive proper treatment. Even those inmates who did receive treatment were subject to re-infestation, because the defendant made no effort to quarantine affected inmates or to properly treat their clothing and bedding to insure that the mites were not spread to others.

Putative class member Jennifer King was sent to MDCDF as a pretrial detainee in December 2016. After one month in "D Pod," she began exhibiting symptoms of scabies and was transferred to E Pod. By the end of March 2017, the majority of inmates housed in E Pod had developed a rash consistent with a scabies infestation.

In February 2017, a pregnant female inmate was transferred to MDCDF. She specifically informed the staff that she had been diagnosed with scabies, but the defendant made no effort to

obtain her medical records, follow up with her treatment, or quarantine her from the general population to insure that her scabies had cleared up prior to her transfer.

On March 10, 2017, Moredock submitted another sick-call request, inquiring why he had not received the treatment prescribed for his scabies re-infestation, which had been ordered several days previously. A member of the medical staff wrote on his chart, "Ivermectin reordered. Had more but given last dose." (Doc. No. 15 ¶ 52.) A few days later, someone crossed out that notation and wrote in, "Benadryl & refer to MD." (*Id.*)

In May 2017, Moredock was released from incarceration still suffering from scabies. He was required to seek treatment outside at his own expense. He was unable to return to work until it cleared up, in order to avoid infecting others, thus suffering lost wages.

In April 2017, the defendant provided a few inmates with medication to treat scabies but denied medication to others. The selective treatment, lack of quarantine, and other ineffective measures facilitated the continued spread of scabies throughout the facility.

On May 1, 2017, after the defendant's repeated failure to treat or quarantine those affected by the scabies infestation, approximately fifty female members of E Pod drafted a letter to the Metro Health Department, describing the spread of the rash and the defendant's failure to treat inmates suffering from it. The letter was confiscated by facility officials and the inmates were not allowed to send it.

On May 8, 2017, forty-nine female inmates housed in "Echo Pod" drafted another letter to the Metro Health Department, requesting assistance with the infestation from which they were suffering and detailing the history of the problem and their unsuccessful attempts to have it addressed. Other inmates sent letters on their own, specifically referencing two pregnant inmates who were taken to Meharry Hospital for checkups, where they were diagnosed with scabies. The

Amended Complaint does not specify whether this letter was confiscated, but a declaration attached to the pleading indicates that it was transmitted to the friend of an inmate, who then mailed it to the Health Department. (B. Blanchard Decl., Doc. No. 28-4 ¶ 19.)

In May 2017, King was transferred from E Pod to A Pod, where plaintiff Snead was housed. When she was transferred, King was covered with a visible rash but had been falsely told by the defendant that her condition was not contagious. Up until that time, no one in A Pod had contracted symptoms of scabies. King had repeatedly requested medical services and filed numerous grievances related to the lack of medical care, all of which were ignored.

When King arrived in A Pod, one of the inmates there who had received some medical training recognized that King had scabies. She informed the defendant of the problem but was ignored. King was placed in an eight-person cell, in close proximity with Snead and other inmates. The other inmates soon began developing their own rashes, and the defendant continued to take no action in the face of the inmates' mounting complaints. The inmates were threatened with disciplinary action and solitary confinement if they complained about their condition or mentioned the word "scabies." If they complained to their families and others outside the prison, their phone privileges were revoked in retaliation.

Snead developed a rash beginning just days after King's transfer. She requested sick call and was seen by a nurse, who told her to change the type of soap she was using. Snead requested sick call a second time but was ignored. Thereafter, she began filing grievances due to the defendant's refusal to provide her access to medical treatment. Being unable to sleep, she became physically ill, developing fever and chills, but was still refused medical treatment. From May 9, 2017 until her departure in June, Snead filed seven grievances, none of which was ever addressed by the defendant. Other inmates began filing daily grievances, all of which the

defendant ignored.

Assistant Warden Hayes visited E Pod on May 15, 2017. She indicated she had heard that the inmates were complaining about a rash and asked how many were having problems. Approximately 100 women raised their hands. The plaintiffs allege that Assistant Warden Hayes scoffed. One inmate protested loudly that the inmates were being "eaten alive" and that something needed to be done. That inmate was handcuffed on the spot and placed in solitary for two weeks. On the same day, the facility was placed on lockdown for forty-eight hours. On May 17, 2017, Snead was able to communicate with her family, and her family reported the situation to the Metro Health Department and requested that it intervene.

Snead was transported to a dermatology clinic on May 19 after her family had made numerous complaints to the Health Department. She was diagnosed with scabies and prescribed a treatment regimen that included ivermectin tablets and two topical creams. In addition, the defendant was specifically informed that every inmate in Snead's pod required treatment. Upon her return to MDCDF, the defendant told her that her prescriptions would not be filled. She was sent to solitary confinement, where she was deprived of a shower for five days, denied clean bedding and clothes, and was not allowed to contact her family.

Snead was released from custody a few weeks later. She immediately went to the ER to obtain medical treatment. She incurred hundreds of dollars in medical and other expenses in dealing with the scabies infestation upon her release.

The plaintiffs allege that, in May and June 2017, the defendant falsified, or had inmates falsify, sick-call requests and grievance forms to remove reference to the term "scabies" or to indicate that the inmates had received treatment when they had not. The defendant's pharmacy nurse was absent for two weeks at the end of May and beginning of June 2017, during which

time medications were not ordered or re-ordered. Throughout June 2017, the defendant continued to ignore sick-call requests from inmates requesting treatment for the rash caused by scabies and continued to threaten them if they mentioned "scabies."

In early July 2017, the defendant's Health Administrator falsely informed the inmates that no one at MDCDF had been diagnosed with scabies.

Finally, on or around July 17, 2017, the Health Department visited the facility. Twelve inmates who had filed grievances about lack of medical treatment were placed in solitary before the Health Department's arrival and were unable to speak with Health Department representatives while they were there.

The plaintiffs allege permanent scarring from their scabies infestation and that they are still recovering. Some putative class members have been unable to return to work after release due to the risk of spreading infection to others and have lost wages as a result.

The plaintiffs allege that the defendant, despite actual knowledge of the infestation among the prison population and of the extremely contagious nature of the infestation, failed to take reasonable steps to mitigate the problem, to quarantine those affected to prevent the spread to others, or to effectively treat those affected. The spread of the contagion was reasonably foreseeable, and the defendant failed to take reasonable steps to prevent or mitigate it. They allege that, as a direct and proximate result of the defendant's actions and inactions, the plaintiffs and putative class members became infested and suffered the consequences of terrible itching, pain, sleeplessness, and, after their release, quarantine, loss of wages, the costs of medical treatment, and the costs of remediating scabies infestations within their own homes and among family members.

Based on the factual allegations set forth in the Amended Complaint, the plaintiffs assert

three causes of action under 42 U.S.C. § 1983: (1) a claim based on the defendant's deliberate indifference to the plaintiffs' and putative class members' serious medical needs, in violation of the Eighth and/or Fourteenth Amendment (depending upon the inmates' status as pretrial detainees or prisoners); (2) a claim based on the inmates' exposure to, and the defendant's failure to protect them from, a state-created danger, in violation of their rights under the Due Process Clause of the Fourteenth Amendment; (3) a deliberate indifference claim under the Eighth and/or Fourteenth Amendment, based on the defendant's failure to train medical staff to address inmates' obvious need to access adequate medical care and medication or to recognize outbreaks of contagious conditions including scabies, among other matters.

In support of their bid to bring a class action, the plaintiffs assert that the defendant has acted or refused to act in a manner that applies generally to the class, such that the claims for damages and injunctive relief on behalf of a class as a whole are appropriate; that questions of law and fact are common to all class members; that the number of persons whose rights have been violated is too numerous to join in the action; that the putative class members are readily identifiable using records maintained by the defendant during its regular course of business; that the plaintiffs have been injured by the defendant's actions in the same way as the other members of the proposed class; and that the plaintiffs will fairly and adequately protect the interests of the class as a whole.

For relief, the plaintiffs seek monetary, compensatory, and punitive damages, as well as equitable relief in the form of "a permanent injunction enjoining the Defendant, its agents, [and] employees . . . from continuing to violate the Eighth and Fourteenth Amendments of the U.S. Constitution and to immediately cease intimidating, threatening, and retaliating against inmates for demanding medical care for their serious medical needs and to immediately provide adequate

oral and topical medication sufficient to fully treat all those diagnosed with scabies" and that the defendant be required to "provide a full medical staff adequate to meet the needs of those infested with scabies and capable of dispensing medication and monitoring their treatment until completion." (Doc. No. 15 ¶¶ 156–57.)

On September 25, 2017, this case was consolidated for all purposes with *John Doe v. CoreCivic of Tennessee, LLC*, No. 3:17-cv-00958, also pending in this court, in which the plaintiff purported to bring suit asserting claims on behalf of a putative class defined as inmates and former inmates at MDCDF who contracted scabies and were denied adequate medical attention by the defendant. John Doe, like Snead and Moredock, had already been released from incarceration by the time he filed his class action. A First Amended Class Action Complaint was filed on October 27, 2017, but it did not include John Doe as a "named" plaintiff.

The plaintiffs filed their Motion for Class Certification on December 20, 2017. (Doc. No. 19.) The motion proposes named plaintiffs Wendy Snead and Edward Moredock as representatives for all three subclasses and asserts that the proposed class and subclasses meet the numerosity, commonality, and typicality requirements of Rule 23(a) of the Federal Rules of Civil Procedure; that Snead and Moredock are adequate class representatives; and that a class should be certified under Rule 23(b)(1), (b)(2) and (b)(3). The plaintiffs filed a Supplemental Memorandum along with a Notice of Filing, to which are attached excerpts from Snead's and Moredock's depositions, along with the affidavits of seven putative class members and one former CoreCivic nurse, and the Declaration of plaintiffs' attorney Bryant Kroll, to which are attached two grievances that were filed by a current CoreCivic nurse.

CoreCivic has filed a Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 31) ("Response"), arguing that none of the proposed subclasses meets the

requirements for certification under Rule 23(a) or (b), as discussed in greater detail below. The plaintiffs filed a Reply (Doc. No. 32) in further support of their certification motion.

## II. Legal Standards for Class Certification

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (citation and internal quotation marks omitted). To be certified, a class must satisfy the prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure: that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012).

In addition to showing that a proposed class meets *all* of the above prerequisites, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998), a motion to certify must establish that the proposed class meets one of the prerequisites under Rule 23(b). Subsection (b) provides that class certification is appropriate, assuming the 23(a) factors are met, if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties

> to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b). The party seeking class certification has the burden of proving the Rule 23 certification requirements. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Dukes*, 564 U.S. at 350. "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied,'" which "sometimes" requires "the court to probe beyond the pleadings." *Id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. [T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (internal citations and quotation marks omitted). In other words, this typically "means that the class determination should be predicated on evidence presented by the parties concerning the maintainability of the class action." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013).

The district court has broad discretion to decide whether to certify a class. *Young*, 693 F.3d at 536.

## III.    Analysis

The defendant raises numerous objections to certification of each of the plaintiffs'

proposed subclasses, asserting that the plaintiffs fail to satisfy many of the Rule 23(a) and any of the Rule 23(b) requirements. Specifically, they argue that:

> (1) the plaintiffs have failed to establish that any of the three proposed subclasses are sufficiently numerous that joinder of the absent class members would be impracticable;
>
> (2) the named plaintiffs are not adequate class representatives, because
>
>> (a) two named plaintiffs are not enough to represent three proposed subclasses;
>>
>> (b) the fact that each plaintiff falls into multiple subclasses raises potential conflicts of interest;
>>
>> (c) the plaintiffs have not distinguished between those who have been actually injured and those seeking only injunctive relief;
>>
>> (d) the named plaintiffs' claims for injunctive relief are moot; and
>>
>> (e) the plaintiffs did not exhaust their administrative remedies;
>
> (3) the plaintiffs cannot establish the typicality requirement, again because their claims for injunctive relief are moot and they did not exhaust their administrative remedies;
>
> (4) the plaintiffs have failed to offer evidence sufficient to establish that they meet the requirements of Rule 23(b)(1) or (b)(2);
>
> (5) the plaintiffs fail to satisfy Rule 23(b)(3) because the subclasses are not "ascertainable," common issues do not predominate over individual issues, and a class action is not superior to other methods of adjudication under the circumstances presented here.

(*See* Doc. No. 31, at 1–2.)

The court will proceed to consider each requirement for certification in turn, in light of the defendant's objections.

### A.     **Rule 23(a)**

#### 1.     *Adequate Representation*

Rule 23(a)(4) allows a class to be certified only if "the representative parties will fairly and adequately protect the interests of the class." As set forth above, the defendant raises

numerous arguments as to why the named plaintiffs fail to meet the adequacy of representation factor. One of these factors, standing, is a threshold matter that the court must address first.

a. Mootness

"[A]ny analysis of class certification must begin with the issue of standing"; only once the court finds that the named plaintiffs have standing may it consider whether they have "representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). To show Article III standing, the named plaintiffs must show that they have been injured, that their injuries are fairly traceable to the defendants' conduct, and that a judgment in their favor would likely redress their injuries. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The court notes, as an initial matter, that both named plaintiffs are *former* inmates of MDCDF, but the class and subclasses they propose to certify would be comprised of both current and former inmates. In addition to damages for alleged past violations, they seek to permanently enjoin the defendant and its agents from continuing to violate current inmates' rights under the Eighth and Fourteenth Amendments by denying them adequate medical care and by intimidating and retaliating against those inmates who demand medical care. The plaintiffs also seek an injunction requiring the defendant to provide a fully staffed medical department adequate to meet prisoners' medical needs. (Doc. No. 15 ¶ 154–55.)

The defendant argues that the named plaintiffs' claims for injunctive relief are moot as a result of their release from custody and that, accordingly, they cannot be deemed "adequate" to represent any class seeking injunctive relief. The plaintiffs respond that defendants should not be permitted to "endlessly circumvent Rule 23(b)(2)" by simply transferring each named plaintiff to a different facility and then claiming that the individual's claims have been rendered moot. (Doc.

No. 32, at 6.)

Generally, a named plaintiff "must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975). The Supreme Court has recognized that the "capable of repetition, yet evading review" exception to this rule may apply to a class action brought by pretrial detainees, noting that "[p]retrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted." *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). It appears that the plaintiffs are attempting to invoke that exception here.

There is a distinction, however, between claims rendered moot by the passage of time while a lawsuit is proceeding and claims that are already moot by the time a plaintiff files suit. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *UAW v. Dana Corp.*, 697 F.2d 718, 720–21 (6th Cir. 1983) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). In other words, the mootness exception that applies in controversies that are "capable of repetition, yet evading review" presumes that the controversy is "live" at the time suit was filed and at the time of class certification. On the other hand, "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("[T]he mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced." (quoting *Renne v. Geary*, 501 U.S. 312, 320 (1991))). Because the named plaintiffs in this case had *already* been

released from MDCDF at the time they filed suit, their claims for prospective injunctive relief had already been rendered moot, and they therefore lacked standing from the outset to bring such claims. As a result, the court lacks subject-matter jurisdiction to adjudicate the claims for injunctive relief, and those claims are subject to dismissal on that basis.

*Ipso facto*, the named plaintiffs are not adequate representatives of current inmates who might have valid claims for prospective injunctive relief. While former inmates and current inmates might have common claims for damages to compensate them for past injuries, a claim for injunctive relief would likely be a major component of the cause of action that would be brought by putative plaintiffs who are still incarcerated. Moreover, as indicated above, the adequacy inquiry frequently overlaps with the typicality requirement. The court finds that the adequacy of the named plaintiffs to represent currently incarcerated individuals is further called into question by the fact that the named plaintiffs' claims are not typical of the types of claims currently incarcerated individuals would bring.

In short, the court finds that, because the named plaintiffs' claims for prospective injunctive relief were moot before they filed suit, they lack standing to bring those claims. As a result, they cannot adequately represent the interests of a class that includes currently incarcerated inmates. The scope of the class the plaintiffs seek to represent must be narrowed to encompass only claims for damages brought by former MDCDF inmates, whether pretrial detainees or prisoners.

### b. Exhaustion

The defendant next argues that the named plaintiffs are not adequate representatives on the basis that they failed to exhaust their administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"). The defendant insists that, once it raises a lack of exhaustion,

the burden shifts to the inmates to demonstrate that they complied with the exhaustion requirements. *Napier v. Laurel Cty.*, 636 F.3d 218, 225 (6th Cir. 2011). The plaintiffs, in response, argue that exhaustion is an affirmative defense that the defendant must plead and prove and, therefore, that it is not an appropriate inquiry at the certification stage. They also maintain that the question of whether the defendant's administrative procedures were available for purposes of the PLRA's exhaustion requirement is common to all members of the proposed class. (See Doc. No. 20, at 13.)

The court finds both parties' arguments to be somewhat beside the point, at least with respect to the named plaintiffs. "Ordinarily, plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before filing suit in court." *Porter v. Nussle*, 534 U.S. 516, 523 (2002). Under the relevant provision of the PLRA, however, enacted in 1996, "[n]o action shall be brought with respect to prison conditions . . . *by a prisoner confined in any jail, prison, or other correctional facility* until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a) (emphasis added). The term "prisoner" is broadly defined to include "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1997e)(h). The named plaintiffs here, having already been released from incarceration at the time they filed suit, are not subject to the exhaustion requirement, since they were not prisoners when they filed suit. *Accord Jackson v. Fong*, 870 F.3d 928, 933 (9th Cir. 2017) ("The exhaustion requirement, however, does not apply to non-prisoners."); *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004) ("In determining whether a plaintiff is a 'prisoner confined in jail, we must look to the status of the plaintiff at the time he brings his suit." (collecting cases)).

The question of exhaustion is therefore not relevant to the claims brought by the named plaintiffs as former inmates. This conclusion also strongly suggests that the named plaintiffs' claims would not be "typical" of the claims that would be raised by current inmates, even inmates at other facilities, with respect to each of whom the affirmative defense of exhaustion would remain relevant and potentially dispositive.

### c. Named Plaintiffs' Adequacy as Class Representatives

Finally, Rule 23(a)(4) allows a class to be certified only if "the representative parties will fairly and adequately protect the interests of the class." This is an essential prerequisite for due process, as a final judgment in a class action binds all class members. *In re Am. Med. Sys.*, 75 F.3d at 1083 (citation omitted). The Sixth Circuit applies a two-part test for determining the adequacy of representation. First, the named representatives "must have common interests with the unnamed members of the class," and second, it must be apparent that the named representatives "will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976). The "adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *In re Am. Med. Sys.*, 75 F.3d at 1083.

The defendant argues only that the plaintiffs have failed to present any evidence regarding the named plaintiffs' willingness to vigorously prosecute the interests of the class. But the defendant misstates the law. The named plaintiffs have expressed their willingness to prosecute this case by filing suit and beginning the discovery process. They have both been deposed, so there is no risk that they have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the

possible competing interests of the attorneys." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 451 (S.D. Ohio 2009). They have also alleged facts and presented evidence that, if a jury finds it to be true, would establish common interests with the unnamed members of a class consisting of former inmates who suffered from untreated scabies as a result of the defendant's deliberate indifference to their serious medical needs. The defendant does not argue otherwise. And the plaintiffs' attorneys have shown themselves willing and able to vigorously represent the interests of their clients.

### d. Potential Conflicts of Interest

The defendant's arguments that the two named plaintiffs have potential conflicts of interest and that the plaintiffs have not made a distinction between putative plaintiffs who have actually been injured and those who seek injunctive relief only have been mooted by the court's conclusion that the named plaintiffs have standing only to bring suit on behalf of a class of former inmates who suffered actual injury as a result of the defendant's practices. The defendant's argument that two named plaintiffs are not sufficient to represent three subclasses is rendered moot by the court's conclusion, discussed below, that the plaintiffs have not satisfied the numerosity requirement except with respect to the Scabies Subclass.

### 2. *Numerosity*

The first subdivision of Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *In re Am. Med. Sys.*, 75 F.3d at 1079. "There is no strict numerical test for determining impracticability of joinder. Rather, [t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Id.* (internal quotation marks and citations omitted). The Sixth Circuit has suggested that the numerosity requirement is met when the class size reaches "substantial proportions." *Id.* Some

courts have found that classes with more than one hundred plaintiffs presumptively satisfy the numerosity requirement, because joinder of "hundreds of persons "would stretch the facilities and abilities of this Court beyond their elastic limit." *Ludwig v. Pilkington N. Am., Inc.*, No. 03 C 1086, 2003 WL 22478842, at *2 (N.D. Ill. Nov. 4, 2003). This court has observed that as few as forty class members may satisfy the numerosity requirement. *See, e.g.*, *City of Goodlettsville v. Priceline.com, Inc.*, 267 F.R.D. 523, 529, 2010 WL 1609964 (M.D. Tenn. 2010) (finding that the plaintiff's identification of 128 counties and municipalities as class members satisfied the numerosity requirement, stating: "According to Newberg's often-cited treatise, 'the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone.'" (quoting 1 William B. Rubenstein, Alba Conte and Herbert B. Newberg, Newberg on Class Actions § 3:5 (4th ed.)).

<u>a. Scabies Subclass</u>

The factual allegations in the Amended Complaint indicate that the numerosity requirement for the Scabies Subclass is met. In addition, the plaintiffs have filed several declarations from putative class members and excerpts from the named plaintiffs' depositions. The evidence submitted by the plaintiffs suggests that that nearly every member of plaintiff Snead's pod had symptoms of scabies at some point, and approximately fifty women signed two different letters to the Metro Health Department, stating that the then-undiagnosed rash affected eighty to one hundred women in the housing unit. (*See* Doc. No. 28-5 & Ex. A.) Similarly, plaintiff Moredock testified in his deposition that he observed approximately forty inmates just in his housing unit who appeared to have scabies and who were not receiving adequate treatment for it. (Doc. No. 28-2, at 42.) Leighanne Shye's declaration states that she saw at least sixty

women in her pod with the scabies rash (Doc. No. 28-6 ¶ 19), and Michael Quinn stated that there were at least fifty inmates in his pod who had scabies in the fall of 2016 (Doc. No. 28-9 ¶ 5). Billie Blanchard testified that 100 women in her pod had the rash. (Doc. No. 28-4 ¶ 16.)

In other words, the plaintiffs have identified several hundred individuals who were denied adequate treatment for scabies during the relevant time frame. Courts have not required evidence of exact class size to satisfy the numerosity requirement. *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005). Although the number is likely not so overwhelmingly large as to be prohibitive of joinder, the number of potential plaintiffs in the Scabies Subclass does make joinder impracticable. The court finds that the numerosity requirement has been met with respect to the Scabies Subclass.

### b. "Denied Prescriptions" and "Denied Medical Attention" Subclasses

The plaintiffs argue that the Declaration of Dawn Meyers, a former CoreCivic nurse who worked at MDCDF, establishes that the defendant routinely ran out of mental health and high blood pressure medication and would fail to refill prescriptions for those conditions for weeks. Her testimony also indicates that pill call was not announced in a manner in which inmates could hear it, thus depriving them of access to medication even when it was available. Similarly, the grievances drafted by Kendra Killian, a nurse currently employed by CoreCivic, constitute evidentiary support for the plaintiff's claims regarding the defendant's failure to train and failure to provide adequate care. (*See* Doc. No. 28-11.) However, while this evidence strongly suggests that the problems at CoreCivic are systemic and not isolated, the plaintiffs make no effort to estimate the number of persons, whether current or former inmates, who would make up these subclasses. They simply argue instead that "[t]he class action device is particularly well-suited in actions brought by prisoners due to the fluid composition of the prison population" and that

"[c]lass actions . . . generally tend to be the norm in actions such as this." (Doc. No. 32, at 3 (quoting *Braggs v. Dunn*, 317 F.R.D. 634, 654 (M.D. Ala. 2016)).)

Although, as stated above, there is no strict numerical test for determining impracticability of joinder, and "the exact number of class members need not be pleaded or proved," *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005) (citation omitted), the "impracticability of joinder must be positively shown, and cannot be speculative." *Id.* (citation omitted). Here, the plaintiffs have failed to provide even a vague estimate of the number of inmates who would fall within these two subclasses, and they have presented no evidence to support a conclusion that the individuals who would qualify as members of these proposed subclasses are so numerous that joinder of each would be impracticable.

Courts have also recognized that other factors besides "hard numbers" may be relevant to the numerosity inquiry, including "(1) judicial economy arising from the avoidance of a multiplicity of actions; (2) the geographic dispersion of class members; (3) the financial resources of class members; (4) the ability of claimants to institute individual lawsuits; (5) the amount of each member's individual claim; (6) knowledge of the names and existence of the potential class members; and (7) whether potential class members have already joined other actions." *Powell v. Tosh*, 280 F.R.D. 296, 303 (W.D. Ky. 2012) (citation omitted), *motion for reconsideration granted on other grounds*, No. 5:09-CV-121, 2012 WL 2601946 (W.D. Ky. July 5, 2012). Besides offering no "hard numbers," the plaintiffs have not presented evidence or discussed the potential impact of any of these other factors on the court's analysis.

The court finds, therefore, that the plaintiffs have not offered sufficient evidence to meet the numerosity requirement with respect to the proposed "Denied Prescriptions" and "Denied Medical Attention" Subclasses. Because the plaintiffs bear the burden of showing that each of

the Rule 23(a) requirements is met with respect to each subclass, the court finds that the plaintiffs have not carried their burden of establishing that certification of the latter two subclasses is warranted. The court will consider the other factors only as they apply to a proposed Scabies Subclass.

### 3. Commonality and Typicality

In order for a class to be certified under Rule 23(a)(2), there must be "questions of law or fact common to the class." Traditionally, to satisfy the commonality requirement of Rule 23(a)(2), plaintiffs have to show only one single issue that is common to all members of the class, not multiple issues. *In re Am. Med. Sys.*, 75 F.3d at 1080; *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003) ("Although Rule 23(a)(2) refers to common questions of law or fact, in the plural, there need only be one question common to the class—though that question must be a 'common issue the resolution of which will advance the litigation.'" (quoting *Sprague v. Gen. Motors*, 133 F.3d 388, 397 (6th Cir. 1998)). "Many courts have held that when the legality of the defendant's standardized conduct toward all members of the proposed class is at issue, the commonality factor is ordinarily met." *Modern Holdings LLC v. Corning, Inc.*, No. 5:13-cv-00405-GFVT, 2018 WL 1546355, at *6 n.5 (E.D. Ky. March 29, 2018) (citations omitted).

"Commonality and typicality tend to merge because both of them serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) (internal quotation marks and citations omitted). "Like the test for commonality, the test for typicality is not demanding and the interests and claims of the various plaintiffs need not be identical." *Reese v. CNH Am., LLC*, 227

F.R.D. 483, 487 (E.D. Mich. 2005).

The plaintiffs assert that they "readily satisfy the low standard for commonality" and that there are "numerous questions of fact and law that are common to all of the members of the proposed class." (Doc. No. 20, at 14, 13.) These common questions include: (1) whether the defendant was deliberately indifferent to the need to implement policies and hire and train staff to prevent the spread of scabies at MDCDF; (2) whether the defendant was deliberately indifferent to the serious medical needs of the individual members of the proposed class; (3) whether the defendant had a policy or practice of failing and refusing to provide adequate medical care to inmates and pretrial detainees; (4) whether the defendant was deliberately indifferent to the need to adequately train its employees to handle the obvious medical needs of inmates; and (5) whether the defendant knowingly or with deliberate indifference tolerated a custom and practice of retaliating against inmates who requested medical care or a referral to outside medical care.

The defendant does not argue that the plaintiffs have failed to satisfy the commonality or typicality requirements, except to argue that "[t]here is no evidence of common conduct or a common injury that would be susceptible of resolution via a single injunction." (Doc. No. 31, at 16.) It is plain, as set forth above, that the named plaintiffs do not have standing to bring claims for prospective injunctive relief, and the scope of the proposed class will be modified accordingly. The court nonetheless finds, for purposes of the motion to certify, that the named plaintiffs have satisfied the commonality and typicality requirements for the Scabies Subclass of former inmates, consisting of former inmates who had a rash consistent with a scabies infestation and who were denied treatment, or whose delayed treatment by the defendant caused the inmate's condition to worsen, since October 1, 2016.

### B.     Rule 23(b)

Having concluded that the plaintiffs have met the Rule 23(a) requirements with respect to a narrowed Scabies Subclass, the court must next consider whether class certification is appropriate under Rule 23(b)(1), (b)(2), or (b)(3). The plaintiff argues that all three subsections of Rule 23(b) apply. The defendant argues that none of them applies.

#### 1.     *Rule 23(b)(1)*

Although the plaintiffs cite to Rule 23(b)(1) generally, they apparently rely only on Rule 23(b)(1)(A), which authorizes certification of a class when "inconsistent or varying adjudications with respect to individual class members . . . would establish incompatible standards of conduct for the party opposing the class." The rule "requires more than a risk that separate judgments would oblige [the defendant] to pay damages to some class members but not to others or pay them different amounts." 7AA Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3d § 1773, at 13. In fact, some courts have held that Rule 23(b)(1)(A)is "not appropriate in an action for damages." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001); *see also Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1083 n.7 (11th Cir. 2000) ("Because Cohen's class seeks compensatory damages, it cannot be certified as a (b)(1)(A) class.").

Here, in support of their claim that a class action is warranted under this rule, the plaintiffs argue only that, in the absence of a class action, "this Court would face numerous *pro se* complaints filed *in forma pauperis*. This is a waste of judicial resources that would inevitably lead to the inconsistent or varying adjudications due to the lack of legal scholarship that accompanies such lawsuits." (Doc. No. 20, at 18.) In response, the defendant argues that the waste of judicial resources is not a relevant criterion for considering whether class certification is

appropriate under Rule 23(b)(1)(A). It also points out that the plaintiffs do not address the more critical factor—whether potentially inconsistent or varying adjudications "would establish incompatible standards of conduct" for CoreCivic. (Doc. No. 31, at 15 (quoting Fed. R. Civ. P. 23(b)(1)(A)).) The plaintiffs do not address this argument in their Reply or attempt to offer any additional support for class certification under this Rule.

The court finds that this rule does not justify class certification. The risk of varying adjudications in this case appears to stem from the possibility that some class members will suffer greater or lesser damages than others, and not from the possibility that different outcomes would impose conflicting obligations on the defendant.

### 2.      *Rule 23(b)(2)*

This rule applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief and corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court has expressly held that claims for monetary relief may not be certified under this provision, "at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Because neither injunctive nor declaratory relief is available to the named plaintiffs, the plaintiffs cannot establish that they are entitled to class certification under Rule 23(b)(2).

### 3.      *Rule 23(b)(3)*

The Supreme Court has recognized that Rule 24(b)(3) is "[f]ramed for situations in which 'class-action treatment is not as clearly called for' as it is in Rule 23(b)(1) and (b)(2) situations" but "permits certification where class suit 'may nevertheless be convenient and desirable.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Adv. Comm. Notes, 28

U.S.C. App. at 697). To qualify for class certification under Rule 23(b)(3), a class must meet two requirements in addition to those set forth in Rule 23(a). They must show that: (1) common questions of law or fact must "predominate over any questions affecting only individual members"; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues. *In re Am. Med. Sys.*, 75 F.3d at 1084. In addition, courts have recognized that "class ascertainability" is "an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592 (3d Cir. 2012).

The defendant argues that certification under Rule 23(b)(3) is not appropriate because (1) the class is not ascertainable; (2) common issues do not predominate over individual issues; and (3) a class action is not superior in this case to individualized litigation.

### a. Whether the Class Is Ascertainable

"[T]he class must be currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 592–93 (citing cases). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* at 593. Further, "[s]ome courts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails." *Id.* (citing cases). "A party seeking class certification must affirmatively demonstrate his compliance with" Rule 23. *Dukes*, 564 U.S. at 350 (2011). That same rule applies to the question of ascertainability. *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).

The plaintiffs aver generally that "[m]embers of the proposed classes will be readily

identifiable and it will be fairly easy to provide notice of the pending action." (Doc. No. 20, at 19–20.) They suggest that some class members can be identified through the defendant's records by reviewing sick-call requests and determining whether and, if so, when they were addressed by the defendant. (*See id.* at 16 (referring to ascertainability of the "Denied Medical Access Class").) The defendant argues only that the class is not ascertainable because the plaintiff's definition of class shows that it is an impermissible fail-safe class.

A "fail-safe" class is one that is "defined in terms of success on the merits," *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015), that is, "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim," *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 702, 825 (7th Cir. 2012). In other words, a fail-safe class is one in which any class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.* "Stated differently, for a class definition to create a fail-safe class, the definition must be framed in terms of the defendant's ultimate liability or the central legal issue in the plaintiff's claims." Erin L. Geller, The Fail-Safe Class As an Independent Bar to Class Certification, 81 Fordham L. Rev. 2769, 2782 (2013). For example, "[c]ourts have held that a class definition is framed in terms of the defendant's liability and thus creates a fail-safe class when there is statutory language embedded in the class definition, when the verdict is embedded in the class definition, or when there is a reference to a legal right or entitlement." *Id.* at 2782–83.

The class the plaintiffs seek to certify, as narrowed by the court's discussion above, is now effectively defined to include former MDCDF inmates who, since October 1, 2016, had a skin rash consistent with a scabies infestation and who were denied treatment altogether or whose delayed treatment by the defendant caused the inmate's condition to worsen. The

proposed class would not be a fail-safe class, because the class definition does not reference the defendant's liability. Class members would fall within the definition if they suffered from a rash that was not treated promptly or at all during the relevant time frame, but they can still lose if they fail to establish that the delay in, or denial of, treatment arose from a policy or custom of the defendant that amounted to deliberate indifference to a serious medical need.

Moreover, the members of the class should be objectively ascertainable based on the defendant's records—assuming the inmates submitted sick-call requests and assuming the defendant maintained such sick-call requests among its records. Even if the defendant did not keep adequate records of sick-call requests or if class members failed to submit sick-call requests related to possible scabies in light of the apparent futility of doing so or a fear of retaliation, class members could likely still be ascertained based on responses to questionnaires to former inmates.

### b. Whether Individual Issues Predominate Over Common Issues

"To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (internal quotation marks and citations omitted). However, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Id.* (internal quotation marks and citation omitted). Thus, for example, "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Id.*

The plaintiffs argue that they have all asserted that the defendant violated their constitutional rights by being deliberately indifferent to their serious medical needs, specifically

with respect to the failure to prevent a scabies outbreak in the first place, to promptly recognize and deal with an outbreak when it inevitably occurred, to prevent the spread of the infestation, or to diagnose and adequately treat those inmates who contracted the condition. They argue that their failure-to-train and state-created-danger claims similarly require the same proof regarding the defendant's failures to act and that the same legal standards will govern each case. The defendant argues that the plaintiffs' threadbare identification of the common legal issues does not satisfy their burden, as "the predominance inquiry requires an in-depth examination of Plaintiffs' claims and an examination regarding how a trial on the merits would proceed." (Doc. No. 31, at 20.) The defendant also insists that individualized proof of proximate cause and injury predominate over any common questions.[1]

To establish a claim of deliberate indifference under 42 U.S.C. § 1983, whether under the Eighth or Fourteenth Amendment, the plaintiffs must show that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005). And, because the plaintiffs sue CoreCivic and not individual corrections officers and medical practitioners, they must show that a CoreCivic "policy or custom" caused the alleged violation of their rights. *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 625 (6th Cir. 2011) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). In addition, each plaintiff would be required to establish damages resulting from the defendant's deliberate indifference.

In this case, the plaintiffs have presented the affidavits or declarations of seven putative

---

[1] The defendant also argues that the Prison Litigation Reform Act ("PLRA") governs this action which, in and of itself, militates against a finding that common issues predominate. Because the class as it now stands is defined as former prisoners only, the PLRA, which governs civil rights actions brought by "prisoner[s] confined in a jail, prison, or other correctional facility," 42 U.S.C. § 1997e, is not applicable.

class members (Doc. Nos. 28-3 through 28-9), in addition to excerpts from Snead's and Moredock's depositions (Doc. Nos. 28-1, 28-2). The individuals uniformly attest that they experienced an infestation that they believe to have been scabies or which was actually diagnosed as scabies. Their experiences vary widely with regard to the manner in which the defendant's staff responded to the condition. In some cases, the defendant never acknowledged that the condition was scabies and never treated it; in other cases, the individual inmate received partial treatment or treatment only after a substantial delay. Some experienced re-infestation; some incurred substantial out-of-pocket expense to deal with treatment after release. Although the individuals' experiences vary substantially, these variations would primarily govern the type and amount of damages that would be sufficient to compensate each plaintiff, assuming the defendant's liability is proven. Moreover, while the issue of damages would require individualized proof, the question of liability would largely be determined by the common issues identified above.

"To demonstrate commonality for the purposes of Rule 23(a)(2), . . . a prospective class must show that its claims 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 550 (7th Cir. 2016), *reh'g en banc denied* (Aug. 3, 2016) (quoting *Dukes*, 564 U.S. at 350). The Seventh Circuit has explained why, under *Dukes*, it found that the plaintiffs had not identified a common question in a class action brought by students against a public school district, alleging that the district delayed or denied disabled students' entry into individualized education programs in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1440 *et seq.*, as follows:

> To illustrate the commonality problem in the certified class, consider two hypothetical students within the class: one has a disability and would be eligible for special education but has never been identified as being disabled nor gone through the IEP process; another was identified as disabled and received a timely IEP meeting, but the child's parents did not attend the IEP meeting and were not notified of their right to do so. Both scenarios involve violations of the IDEA, but what common question can be answered that would assist the court in determining [the district's] liability for each? On the plaintiffs' theory, that question is something like this: Did [the district] fulfill its IDEA obligations to each child? But while that generic question is surely a part of both children's claims, it must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation.

*Phillips*, 828 F.3d at 551 (quoting *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 498 (7th Cir. 2012)); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the defendant's alleged injurious conduct differs from plaintiff to plaintiff, . . . no common answers are likely to be found."). The Seventh Circuit also noted, however, that "an illegal policy might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class," but found that the *Jamie S.* plaintiffs had failed to present proof of any such policy. *Phillips*, 828 F.3d at 551.

In *Phillips*, current and former pretrial jail detainees brought claims under § 1983 against the county and county sheriff, alleging deliberate indifference to their need for dental care. The district court initially certified two classes, one "(b)(2)" class seeking injunctive relief only, consisting of "[a]ll persons presently confined at the Cook County Jail who are experiencing dental pain and who have waited more than seven days after making a written request for treatment of that pain without having been examined by a dentist," and the other a "(b)(3)" class, seeking damages, consisting of "[a]ll inmates housed at Cook County Department of Corrections on or after January 1, 2007, who have made a written request for dental care because of acute pain and who suffered prolonged and unnecessary pain because of lack of treatment." *Smentek v. Sheriff of Cook Cty.*, No. 09 C 529, 2014 WL 7330792, at *1 (N.D. Ill. Dec. 22, 2014). After a

bench trial on injunctive relief, the court decertified the (b)(2) class, largely on the basis that the original grounds for injunctive relief—which were also the basis for the court's initial finding of commonality—had been rendered moot by an intervening action against Cook County by the Department of Justice, which resulted in a consent decree specifically requiring improved dental care and adequate dentist staffing to avoid unreasonable delays in dental care. *Phillips*, 828 F.3d at 545. Specifically, the common question of the inadequately low number of dentists no longer existed, and the dental care provider had "implemented policies that aligned with national standards." *Id.* at 548. The district court granted the defendant's motion to decertify on the grounds that "there was no longer a single identifiable remedy that could help all class members." *Id.* at 549.[2] Without a certifiable class, the court also denied as moot the motion for a permanent injunction. The Seventh Circuit affirmed, finding that the district court had not abused its discretion in decertifying the (b)(2) class.

The court also rejected the plaintiffs' alternative proposed "common" questions, which were whether the jail's failure to require a face-to-face evaluation with a nurse within twenty four hours of a written complaint of dental pain result in gratuitous pain, and whether the jail's failure to provide timely "return to clinic" appointments result in gratuitous pain, both of which concerned delays in medical treatment. The Seventh Circuit observed that it had previously held that

> when assessing deliberate indifference claims, a delay in medical treatment is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment. The more significant the dental pain, the more immediate is the need for treatment. In determining whether such complaints can be characterized appropriately as presenting a common question susceptible to class resolution,

---

[2] The court modified the (b)(3) class to encompass only those detainees whose claims arose when the jail had only one dentist. The Seventh Circuit noted that that class's claims remained pending.

careful examination of the context is crucial.

*Id.* at 555 (internal citations and quotation marks omitted). The court found that the delays in question in that case were inherently contextual. That is, "simply establishing that detainees at the Jail consistently wait more than twenty-four hours does not advance materially any individuals' claim of deliberate indifference." *Id.* at 556 Likewise, the question of whether a return-to-clinic visit was "timely" would depend on the precise nature of the individual detainee's dental problem. In light of the inherently contextual nature of the questions, the court held that "the district court did not abuse its discretion in concluding that the questions the detainees present about the length of delay in medical treatment are incapable of being solved on a classwide basis." *Id.* at 556.

On the other hand, the court distinguished cases in which the plaintiffs were able to "present classwide evidence that a prison is engaging in a policy or practice which rises to the level of a systemic indifference," in which courts were able to identify "'conduct common to members of the class' which advances the litigation." *Id.* at 557 (quoting *Suchanek*, 764 F.3d at 756, and citing *Parsons v. Ryan*, 754 F.3d 657, 679–80, 683 (9th Cir. 2014) (finding a "common question" in a lawsuit brought by prison inmates who alleged, and presented proof, that the prison severely understaffed medical facilities and had a practice of placing inmates in isolation with insufficient nutrition, noting that the "class members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices, rather than only in their advancement of a general Eighth Amendment legal theory"); *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989) (finding that the plaintiff stated a claim of systemic deliberate indifference where a prison allegedly had failed to make any changes to its procedures following the death of an inmate who had been prescribed medicine over the phone); *Wellman v.*

*Faulkner*, 715 F.2d 269, 272–74 (7th Cir. 1983) (finding that the plaintiff alleged systemic deficiencies at a prison where two out of three physicians could not communicate effectively with patients because of a language barrier, a staff psychiatrist position had been unfilled for two years, prisoners had been denied vital surgeries for two to five years, and medical supplies were being reused because they had not been restocked)). Likewise, where the plaintiffs asserted class claims of fraudulent misrepresentation against a seller of pharmaceuticals, the Seventh Circuit found that a "common question" existed as to whether the seller had made fraudulent statements that its product has been "clinically tested and "scientifically formulated." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 673 (7th Cir. 2015). The court found in that case that the plaintiffs' claims hinged, not on whether individuals received health benefits from the product, but on whether the defendant's representations were deceptive, which could be answered "in one stroke." *Id.* (quoting *Dukes*, 564 U.S. at 350).

In *Phillips*, the court also reinforced the principal that the common question "need not resolve every issue in the case" and that it is "routine in class actions to have a final phase in which individualized proof be submitted." *Phillips*, 828 F.3d at 551 (quoting *Suchanek*, 764 F.3d at 756). Thus, for example, in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), the court certified a class based on the presentation of a common question of whether the defendant employer had implemented employment policies that potentially had a discriminatory impact. *Id.* at 488–89. The court found that, if the plaintiffs prevailed on their claim of a disparate impact, "hundreds of separate trials may be necessary to determine which class members were actually adversely affected. . . . But at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful." *Id.* at 491. In short, a common question generally requires "*conduct* common to members of the

class,'" *Suchanek*, 764 F.3d at 756 (emphasis in original), and the common question must "drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal quotation marks omitted).

Based on these principles, the court finds that the plaintiffs have presented a common question based on allegedly unconstitutional policies and customs of the defendant. Further, it appears to the court, at this juncture, that the common question of whether the defendant was deliberately indifferent at the corporate level predominates over individual questions of the amount and type of damages each individual plaintiff might have suffered as a result of such policies.

### c. Whether a Class Action Is Superior to Individual Actions

Rule 23(b)(3) identifies factors that are relevant to a determination of whether a class action is superior to individual actions, including "class members' interests in individually controlling the prosecution . . . of separate actions," "the extent and nature of any litigation concerning the controversy already begun by . . . class members," "the desirability . . . of concentrating the litigation . . . in the particular forum, and "the likely difficulties in managing a class action." *Id.* "While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high," it does contemplate the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods.*, 521 U.S. at 616 (internal quotation marks and citation omitted). The Supreme Court, in fact, has recognized that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Id.* (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.

1997)).

The plaintiffs here argue that the individual class members' interest in controlling the prosecution of separate actions is low and suggest, without actual evidence, that "[t]his case has been highly publicized and Plaintiffs' counsel have been contacted by numerous members of the proposed classes, none of [whom] have filed litigation or announced any intention to do so." (Doc. No. 20, at 19.) Second, they argue that this court is a "highly desirable forum" in which to litigate, given that the defendant is organized here, venue for all similar claims is appropriate in this court, and "it makes no sense to have dozens of simultaneous" and almost identical cases pending in the same court. (*Id.*) Third, they argue that members of the class are readily identifiable and that notice in the pending action should not pose substantial difficulty, particularly, again, because nearly all of the class members will be found within this forum. And finally, they claim, without reference to any actual evidence in the record, that the case involves relatively small individual recoveries, "possibly under $250" for many of the individuals, as a consequence of which individual plaintiffs would be discouraged from bringing individual lawsuits. (*Id.* at 20.)

The defendant, on the other hand, argues that the need for individualized proof on the elements of proximate cause and injury renders the proposed (b)(3) class "unmanageable"; that the plaintiffs have "neglected to present the Court with a trial plan" regarding how they intend to manage the litigation and prove their claims; that the plaintiffs have not provided actual proof that each individual's damages are low or that there is limited interest by individuals in pursuing their claims outside of a class; and that the plaintiffs ignore the fact that at least eight detainees have already filed individual actions in this court against CoreCivic relating to exposure to, or contraction of, scabies. (Doc. No. 31, at 24–25.)

The court notes as an initial matter that, of the eight cases referenced by CoreCivic,[3] all were filed *pro se* by plaintiffs who are, or were at the time they filed suit, still inmates at MDCDF; four have already been dismissed for failure to exhaust; in one, a Report and Recommendation is pending recommending dismissal for failure to prosecute; and in another, a recently filed motion for summary judgment is pending. In the remaining two, dispositive motions have not yet been filed but likely will be. Generally, the posture and disposition of these cases together weigh in favor of a finding that a class action is appropriate: clearly, none of these plaintiffs was individually able to enlist the aid of an attorney, and their attempts to pursue their claims individually have been largely unsuccessful. Moreover, the fact that these individuals were all still incarcerated at the time suit was filed removes them from a putative class of already-released individuals seeking retrospective damages relief only, and the defendants have not pointed to any scabies-related lawsuits filed by claimants after their release from MDCDF. In other words, the class members do not appear to have a strong interest in individually controlling the prosecution of separate actions.

Second, this court is a desirable forum for the reasons cited by the plaintiffs: the defendant is located here and MDCDF is located here, meaning that most of the plaintiffs will also be located here. Venue is clearly appropriate here, and all or nearly all discovery materials should be located in this district as well. Regarding damages, though the plaintiffs have failed to offer any actual proof of the value of any plaintiff's claims, the court nonetheless finds their assessment of the value of the majority of claims to be realistic in light of the types of damages

---

[3] *See Pearson v. CoreCivic, Inc.*, No. 3:17-cv-950; *Whitsett v. CoreCivic, Inc.*, No. 3:17-cv-1091; *Hawkins v. Metro. Gov't of Nashville*, No. 3:17-cv-1127; *Vaughn v. CoreCivic, Inc.*, No. 3:17-cv-1146; *Norris v. CoreCivic, Inc.*, No. 3:17-cv-1150; *Mass v. CoreCivic, Inc.*, No. 3:17-cv-1206; *Hunter v. CoreCivic, Inc.*, No. 3:17-cv-1269; *Vaughn v. CoreCivic, Inc.*, No. 3:17-cv-1303.

sought.

And finally, regarding the management of the case, the court finds that the defendant's concerns are overwrought. The question of CoreCivic's policies and customs pertaining to the prevention, spread, and treatment of a highly communicable and common parasitic infestation predominates in this case, and the court is aware that individual assessments of each individual's damages may ultimately be necessary. This factor alone does not override the conclusion that a class action is superior to individual actions to determine the defendant's liability.

## IV.    Conclusion

For the reasons set forth herein, the plaintiffs' Motion for Class Certification (Doc. No. 19) will be granted in part. The court will deny certification of the "Denied Prescriptions" and "Denied Medical Attention" Subclasses and deny certification of any class under Rule 23(b)(1) or (b)(2), because the named plaintiffs lack standing to bring claims for injunctive or declaratory relief. The court will grant the motion insofar as it will conditionally certify a class defined as all *former* inmates of MDCDF who are not currently incarcerated and who, while still incarcerated at MDCDF, had a skin rash consistent with a scabies infestation and who were denied treatment, or whose delayed treatment caused the condition to worsen, since October 1, 2016.

An appropriate Order is entered herewith.

ENTER this 27th day of June 2018.

ALETA A. TRAUGER
United States District Judge